**Francisco E. SALAZAR, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2548.**

Supreme Court of Alaska.

Dec. 17, 1976.

Brian C. Shortell, Public Defender, and Frank S. Koziol, Jr., Asst. Public Defender, Anchorage, for appellant.

Avrum M. Gross, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., and Ivan Lawner, Asst. Dist. Atty., Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

ERWIN, Justice.

This appeal presents seven major specifications of error arising from the first degree murder conviction of Francisco Salazar. The issues necessarily decided on appeal of this case will be addressed seriatim after a statement of the facts.

In the early morning hours of July 12, 1974, while traveling south on the Tudor-Muldoon Roadway, a passer-by observed a vehicle burning in the vicinity of the Chugach Hills subdivision. After watching the fire for a short period of time, the passer-by called the Fire Department.

On the following afternoon a cyclist observed a body lying in a field near the Chugach Hills subdivision. Police officers found the body to be that of a dead male which apparently had been repeatedly run over by an automobile. A search of the deceased's wallet, which contained about $200, identified the man as Lorenzo Wilson. When the shift supervisor for the Alaska State Troopers arrived at the scene, he informed the investigating officer of the report of the burning vehicle observed the previous night. After a brief search the vehicle was located approximately ¼-mile from the body.

As a result of the ensuing investigation, it was determined that the deceased was in fact Lorenzo Wilson, that it was his vehicle which had been burned on July 12, and further, that he had been killed by having been run over repeatedly by this vehicle. Other information gathered by the police disclosed that Wilson and another man had purchased gasoline in Wilson's vehicle only minutes before it had been seen burning by the passer-by. A gas station attendant informed police that Wilson was the passenger and the man driving the car had "Negroid features."

Police investigations first focused on the son of a married woman with whom Wilson

was having an affair. However, after conducting a photo line-up with the service station attendant and administering a lie-detector test to the son, further investigation was dropped.

Police investigations shifted focus the week following the homicide after a conversation with Gary Tolen which implicated Francisco (Pancho) Salazar in Wilson's death. Tolen told the troopers he had driven Salazar to work in the Chugach Hills area on July 12, the morning of the murder. As they were driving down the Tudor-Muldoon Roadway, Salazar said that he had spotted a burned-out car to their right. He asked Tolen to drive to it. Although Tolen could not see the vehicle, he followed Salazar's directions. Once the vehicle was located, both Tolen and Salazar rummaged through it, and Tolen removed, among other items, a tape deck. As his motive for going to the police with this story, Tolen explained that on the evening of July 14th he stopped by his parents' house and showed the tape deck to them and to his job foreman, Ken Kropidlowski, who happened to be visiting the house. After Kropidlowski departed, Tolen's mother told him that based on her conversation with Kropidlowski, she believed the tape deck had been taken from a car which had been used in a murder and that Kropidlowski felt Salazar was involved. Fearful that he might be implicated in the crime by virtue of the fact that he had put his fingerprints all over Wilson's car, Tolen decided to go to the police and clear himself of any involvement in the murder.

Police interviews with Kropidlowski further implicated Salazar. He said that he had talked with Salazar on July 12, 1974, the day of the murder, and on the following day. Kropidlowski stated that Salazar had acted "pretty nervous" and had said that someone else had committed the crime in Mountain View and had planned to transport the body to the Muldoon area, place the car over the body and burn the car.

On Wednesday, July 17, the troopers telephoned Fred Gregory, the owner of the company for which Salazar, Kropidlowski and Tolen worked, and agreed to meet with him at a local Anchorage restaurant when told that Gregory would not give any information over the telephone. It is disputed whether the troopers informed Gregory that Salazar was a suspect in the murder investigation or whether they merely informed him that Salazar was in trouble. In any event, later that day Salazar was fired by Gregory, after having been informed that he was in "serious trouble."

On that same day Salazar and his girlfriend, Janice Maillelle, moved out of the house they had been sharing with another man, Henry Nelson. In the week that followed the couple stayed with friends in three different locations. They were eventually found in the basement of a friend's house, and Salazar was arrested.

In a police interview conducted shortly after Salazar's arrest, 19-year-old Ms. Maillelle made a number of statements, which she later recanted, indicating that Salazar had participated in the murder. She stated that Salazar and Nelson had left the house sometime during the early morning of July 12th and that Salazar had told her he had driven over a black man but could not remember exactly how he had killed him.

At the subsequent jury trial the State was unable to show any connection between Salazar and the deceased, nor were they able to show a motive for the killing. It was the State's theory, however, that Henry Nelson, Salazar's roommate, had been driving Wilson's car shortly before Wilson was killed and that Nelson had assisted Salazar in the homicide. The State's case was founded on Salazar's alleged admissions to Janice Maillelle and Ken Kropidlowski and on the fact that he went into hiding when he discovered the police were looking for him. In addition, the State maintained that Salazar could not have seen Wilson's vehicle from the Tudor-Muldoon Roadway when he was riding in Tolen's car, and thus he must have had prior knowledge of the vehicle's location.

The defense asserted was alibi. Salazar testified that he and Janice Maillelle had

spent the evening of the killing, July 11th, on Fourth Avenue in Anchorage traversing from saloon to saloon, beginning at the Elbow Room and climaxing with a visit to the Montana Club. When they arrived home around 11:30 p. m., their roommate, Henry Nelson, was in bed. Janice and the defendant also retired but were awakened when Evelyn Pederson and Eddie Mitchell, two friends, arrived to spend the night. Salazar returned to bed around 1:00 a. m. and awoke at 5:00–5:30 a. m.

At the trial Evelyn Pederson testified that she had spent the night in the living room and would have seen Salazar depart the house if he had done so during the night. She maintained that no one left until 6:00 a. m. when Salazar and Nelson departed.

In addition, Janice Maillelle denied the truth of the statements she had given to the police shortly after Salazar's arrest. She testified that she told the police what they wanted to hear so that they would leave her alone. She further testified that as far as she knew, Salazar and Nelson did not leave the house until around 6:00 a. m.

Salazar explained that he had gone into hiding because he had been involved in an automobile accident earlier in the year and had failed to make the restitutionary payments required in order to maintain his probationary status. Thus, when informed by Gregory that he was in trouble, he assumed that the police had a warrant for his arrest for violating probation, whereupon he went on a "bummer." Salazar, while still in hiding, learned for the first time that the police were looking for him on a murder charge.

After deliberating three days, the jury found Salazar guilty of first degree murder. He was subsequently sentenced to life imprisonment.

## THE DENIAL OF CONTINUANCE

We find appellant Salazar's allegation of error pertaining to the failure of the trial

court to grant a one-day continuance for the purpose of hearing testimony of a crucial witness to be dispositive of this case. Briefly stated, this contention arises out of the following facts.

On the afternoon of January 28, 1975, Mr. Koziol, counsel for the defense, informed the court that he had just received word that Officer Mark Stewart, a surrebuttal witness, had missed the flight from Sitka to Anchorage that day but would arrive the following day at 4:40 p. m. Mr. Koziol further stated that on January 24th he had issued a subpoena for January 27th but that Stewart, who was at the Public Safety Academy in Sitka, had not been contacted about the subpoena until the afternoon of the 28th. The court granted the one-day continuance requested by the defense.

In the afternoon of the 29th the prosecutor informed the court that Officer Stewart had been unable to depart from Sitka because of a snowstorm and that weather permitting, he would arrive the next afternoon. The trial judge initially stated that he was inclined to grant the continuance and recessed for the day. Shortly thereafter the court reconvened and reversed its earlier position, thereby denying the continuance. It therefore was not possible to secure the testimony of the witness prior to submission of the case to the jury. Salazar submits that the trial court committed reversible error in denying the one-day continuance.

■ We begin by noting that Alaska subscribes to the general rule that a trial court's refusal to grant a continuance will not be disturbed on appeal absent a demonstration of an abuse of discretion.[1] As we noted in *Klockenbrink v. State*, 472 P.2d 958 (Alaska 1970):

Granting or denying a continuance traditionally has been within the discretion of the trial judge, and not every denial of a request for additional time violates due process. To constitute error an abuse of

1. *Sullivan v. State*, 509 P.2d 832, 834 (Alaska 1973); *Mead v. State*, 445 P.2d 229, 230–231

(Alaska 1968), cert. denied, 396 U.S. 855, 90 S.Ct. 117, 24 L.Ed.2d 104 (1969).

this discretion must be shown. . . . It is only an arbitrary refusal that is violative of due process and that question depends upon the circumstances of each case, *especially the reasons supporting the request for continuance.*[2]

In *Klockenbrink* we further observed that while "there is no well-established standard for determining when a denial has been arbitrary, we are not without guidelines for making such a determination."[3]

■ We reaffirm the standard in *Klockenbrink* that the prime focus of inquiry must be on the reason for the requested continuance. We now articulate additional factors which are among those that the trial court should consider on a request to enable a party to secure further testimony. Considerations deemed pertinent by other courts which we find to be meritorious, as well as considerations we have utilized in the past, are: (1) whether the testimony is material to the case; (2) whether the testimony can be elicited from another source; (3) whether the testimony is cumulative; (4) probability of securing the absent witness in a reasonable time; (5) whether the requesting party was diligent and acting in good faith; (6) the inconvenience to the court and/or others; and (7) the likelihood that the testimony would have affected the jury's verdict.[4] We turn first to the materiality of the testimony not heard in the case at bar.

The defendant testified that on the morning of the murder, July 12th, Gary Tolen gave him a ride to the Chugach Foothills area where he planned to work that day. Salazar stated that while looking for the road on which to turn, he observed a vehicle from the Tudor-Muldoon Roadway. After pointing the vehicle out to Tolen, Tolen brought his car to a stop, backed up in order to turn off onto an access road which he had passed, and drove to the vehicle. Upon reaching the vehicle, the pair rummaged through it and removed a few items.

In rebuttal the State called Tolen, who testified that Salazar observed Wilson's vehicle from the road on which they drove. Tolen testified that he could not see the vehicle when the defendant first mentioned it a block before the turn-off, nor could he see it as he backed up to go down the road.

It was at this point in the proceedings that the defense requested a continuance in order to present the testimony of Officer Stewart. After the judge ruled that the proceeding must continue without the missing witness, defense counsel made an offer of proof as to the content of Officer Stewart's anticipated testimony. Counsel stated that he would testify that he could clearly see the hood and top of the subject vehicle from the Tudor-Muldoon Roadway. In reiterating its previous ruling the court observed:

> The Court: . . . I don't think I'm depriving the defendant of a process. I think he could have been more diligent, could have followed up on it. And this trial—I'm going into the third week and I'm—I'm never going to finish it, and I don't know how critical this testimony is and I have no idea when the witness is going to be here, if ever.

In an evidentiary hearing held subsequent to the verdict, Stewart was given an opportunity to expound on what his testimony would have been had he appeared at the trial. Stewart stated that he was instructed by another officer to locate a burned-out vehicle in the Chugach Hills area. Traveling on the shoulder of the road in the same direction as the Salazar/Tolen vehicle, he observed what appeared to be a burned-out car. Specifically, he could see the top portions of the vehicle and may

---

**2.** 472 P.2d at 964 (citations omitted, emphasis added).

**3.** *Id.* at 964 (footnote omitted).

**4.** The first three considerations were outlined by the California Supreme Court in *Jennings v. Superior Court of Contra Costa County*, 66 Cal.2d 867, 59 Cal.Rptr. 440, 428 P.2d 304, 310

(1967). Items 4 and 5 are set out in *People v. Foy*, 32 N.Y.2d 473, 346 N.Y.S.2d 245, 299 N.E.2d 664, 667 (1973). Item 6 is set forth in *Burleson v. State*, 543 P.2d 1195, 1200 (Alaska 1975). The final consideration was relied on in *Lovelady v. State*, 478 P.2d 983, 986–87 (Okl. Cr.App.1970).

have been able to see the trunk. It was his recollection that while on the Tudor-Muldoon Roadway he first sighted the vehicle about 300 feet from the access road upon which he ultimately turned in order to reach the vehicle, and that he was able to see it until he made the turn. Thus, Stewart's observation supported Salazar's testimony that he saw Wilson's vehicle while driving down the Tudor-Muldoon Roadway with Tolen.

We find that this question may have been a critical consideration in the jury's decision. In final argument the prosecutor pointed out that Salazar could not see the car from the road but knew it was there only because he had driven it there only hours before. If the jury was to believe Salazar could not see Wilson's vehicle from the roadway, this would have been strong circumstantial evidence that he had previous knowledge as to the car's location. On the other hand, if the defense was to show that Salazar could see Wilson's car, it would break a key link in the prosecution case as well as bolster his credibility with the jury. Therefore, in viewing the circumstances surrounding this case and in considering the first of our enumerated criteria, we find the proposed testimony of Officer Stewart to be material.

Next we ask the question, can the refused testimony be elicited from another source? The record reflects that neither the defense nor the prosecution was aware of other witnesses who could have testified on this point. At the time of trial, the vehicle in question had been moved. Further, the actual condition of the Tudor-Muldoon Roadway had changed after the time of the alleged sighting of the vehicle due to the cessation of road construction. While a video tape record of the area was made shortly after the alleged sighting by Salazar and remained available at trial, this tape did not depict the location of the subject vehicle from the same location on the Tudor-Muldoon Roadway where Salazar asserts he made the sighting. Therefore, we are of the opinion the testimony was not available from other sources.

We further conclude that inasmuch as there was no testimony introduced at trial to corroborate Salazar's testimony regarding the visibility of the vehicle that the officer's testimony would not have been cumulative.

The probability of securing the absent witness in a reasonable period of time seems very likely on these facts. The witness was attempting to return to Anchorage once the weather conditions allowed the departure of aircraft from Sitka. At no time did the court check on weather conditions to determine the likelihood of a break in the storm in order to ascertain the probable arrival time of Officer Stewart. Since the officer had been subpoenaed, it is reasonable to assume that there would have been no unnecessary delay in his return to Anchorage.

The question as to whether the requesting party was diligent and acting in good faith is one we find to be extremely critical, for we do not intend the Continuance motion to become the vehicle of bad faith or a tool for those who fail to prepare court matters in a less than diligent manner. In this case we note that the facts indicate that on Tuesday, January 28, immediately after Tolen's testimony, defense counsel informed the court that he intended to call a surrebuttal witness, Officer Mark Stewart. Defense counsel explained that a subpoena had issued for Stewart on January 24th and was received by Judicial Services on that day; it directed Stewart to appear on Monday, January 27, at 2:00 p. m. However, because Stewart was not contacted by Judicial Services until January 28th, he had not arrived on schedule. Defense counsel observed that because Stewart was in Sitka, he would not arrive until the next day at 4:40 p. m. Asserting that he had been diligent in having subpoenaed Stewart four days prior to the time he was needed to testify, defense counsel requested a one-day continuance. The court, noting that it was not the fault of the defense that Stewart had not arrived, granted the continuance for one day.

The following day at approximately 4:00 p. m., the prosecutor announced that he had called Sitka at 1:20 p. m. and had been informed that Stewart did not depart due to a snowstorm and that the earliest flight to Anchorage was the following afternoon. When the court stated that the case would be continued until Stewart arrived, the prosecutor objected strongly. The court, noting that the defense had no control over the reason for the continuance, i. e., the snowstorm, granted the one-day continuance and recessed. This continuance order was reversed after a recess.

■ We find the record reflects defense counsel acted in good faith in requesting the continuance and acted with due diligence in attempting to secure Stewart's testimony for trial. While the trial court, in denying the continuance on the 29th, stated that the defendant "could have been more diligent," this appears questionable in light of the fact that on the previous day he observed that the defendant "issued his subpoena in time and it doesn't look like it's any fault of his that his witness isn't here." This is particularly true since the only intervening factor was the snowstorm which prevented Stewart from leaving Sitka. Additionally, there was no testimony entered at trial, or subsequent contentions raised on appeal, which indicates defense counsel had any motive for requesting this continuance other than to allow Officer Stewart to testify.

■ As to whether the requested continuance would have created inconvenience to the court or others, the record below reflects that some inconvenience would have resulted. In a post-trial evidentiary hearing the prosecutor recalled that while discussing the proposed continuance in chambers, the judge noted a trial was scheduled to begin the next morning and that a jury had already been summoned. The defense counsel recalled the court's ex-

pressing concern over the fact the case had already cost thousands of dollars. The trial judge observed at the post-trial evidentiary hearing:

> Well, I think that—I think now and I thought then that the case consumed much more time than was really necessary. And I—and this is a state of limited resources. My only observation is if they had 4 or 5 Salazar trials, I don't think the system would—could support trials of that nature and that duration.
>
> . . .

As we noted in *Burleson v. State*, 543 P.2d 1195, 1199 (Alaska 1975),

> A trial court in exercising its discretion in [requests for continuance] must give great weight to any substantial prejudice to the rights of the moving party. *The court must also consider the interests of the opposing party, the public and the judicial system in the prompt disposition of litigation.* (emphasis added)

However, we further stated:

> Efficiency in the operation of the court system and the interest of the public in prompt disposition of criminal cases dictate that unnecessary delays be avoided. Of course, such *considerations must be subordinated if substantial rights of a defendant are affected.*[5]

While we reaffirm our position that efficient operation of the court system is a prime factor for consideration when a continuance is requested, we nonetheless must examine the basis for the requested continuance in order to determine what rights of the defendant, if any, are thereby affected. Moreover, a number of courts have found that when a witness is identified to the court and can be found within the jurisdiction, a short continuance should not be denied after a showing of some diligence and good faith by the requesting party merely because of possible inconveniences to the court or others.[6] Here we find the incon-

---

5. 543 P.2d at 1200 (emphasis added).

6. *People v. Foy*, 32 N.Y.2d 473, 346 N.Y.S.2d 245, 299 N.E.2d 664, 667 (1973). *See also People v. Buckey*, 23 Cal.App.3d 740, 100 Cal.Rptr. 551, 553 (1972); *People v. Street*, 133 Ill.App.2d 536, 273 N.E.2d 172, 175–177 (1971).

venience to the court and other affected parties to be minimal when weighed against the effect of the denial on the defendant's right to due process.

 Finally we turn to the question of whether the refused testimony is likely to have affected the jury's verdict. It appears that the jury, which deliberated for three days, had some difficulty with the question of whether Salazar could see Wilson's vehicle from the Tudor-Muldoon Roadway, for they requested a playback of both Tolen's and Salazar's testimonies on this issue. Given the significance of this testimony, both as a substantive issue of proof as well as its effect on Salazar's credibility as a witness, we find a high likelihood that this refused testimony would have affected the deliberations of the fact finder.

 Once, the defendant's case is viewed in light of the preceding considerations and thereby demonstrates that the particular facts of his case favor a continuance, still one final barrier must be overcome before this court will find an abuse of discretion by the lower court requiring reversal. As we stated in the *Klockenbrink* case [7] and later reiterated in *Sullivan v. State*,[8] for guidance on the question of whether reversal is warranted we adopt the principle set forth in *People v. Solomon*, 24 Ill.2d 586, 182 N.E.2d 736 (1962), wherein it is stated:

> The granting of a continuance . . . necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound judicial discretion of the trial court. Before a judgment of conviction will be reversed because of the denial of such a motion, *it must appear that the refusal of additional time in some manner embarrassed the accused in preparing his defense and prejudiced his rights.*[9]

7. 472 P.2d at 964.

8. 509 P.2d 832, 835 (Alaska 1973).

9. 182 N.E.2d at 738 (citations omitted, emphasis added).

In this regard we held in *Doe v. State*, 487 P.2d 47, 57 (Alaska 1971), that the prejudice could be presumed in certain cases.

 In using the criteria of the *Solomon* case, we begin by seeking to determine if the defendant Salazar's rights have been prejudiced. We note that the right of the accused in a criminal prosecution to call favorable witnesses is a fundamental right guaranteed by the Sixth Amendment of the United States Constitution.[10] This right was made applicable to the states by virtue of the Fourteenth Amendment in the case of *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). In that case Mr. Chief Justice Warren observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.[11]

 We find that in this case the continuance was sought so as to allow a critical absent witness to appear and testify on behalf of the defendant. Further, we find the importance of this witness' testimony was so central to the defendant's case that to deny the defendant the right to present this witness, absent justification, was ·to deny the defendant Salazar his Sixth Amendment rights. Since no justification is present in the record upon which to base the continuance denial, we accordingly find the denial to be arbitrary and therefore an abuse of discretion. We accordingly reverse.

10. This same right is provided in an identical provision of the Alaska State Constitution, Article I, section 11.

11. 388 U.S. at 19, 87 S.Ct. at 1923.

## MARITAL PRIVILEGE/RIGHT TO CONFRONTATION

While we need not consider other claims of error herein, it has been the policy of the court to do so when we are convinced the same problem involving the claim of error will be raised on retrial. In such a situation the postponement of consideration of the issue until a possible second appeal results in a misapplication of judicial resources, which by ruling on the claim of error presently, we seek to avoid.

We thus consider the issue of whether it was error to refuse to permit the wife of Gary Tolen to testify as to his statements about the murder purportedly made by him to her under the marital privilege.[12]

Salazar contends that his cross-examination of Gary Tolen, a State's witness, was impermissibly limited by the trial judge and that he was prevented from calling Gary Tolen's wife, Carolyn, as a surrebuttal witness. It is argued that these limitations violated Salazar's constitutional rights of confrontation and to compel witnesses on his behalf and, in addition, denied him due process of law.

The record reflects that before calling Gary Tolen as a rebuttal witness, the prosecutor sought a protective order to prohibit defense counsel from questioning Tolen about a purported admission he had made to his wife about the death of Lorenzo Wilson. The basis for the anticipated cross-examination was a statement given to the police by Mrs. Tolen in which she remarked that her husband admitted killing Wilson.

The trial court rejected the prosecutor's initial request for the protective order.

The prosecutor thereafter cited Criminal Rule 26(b)(2) for the proposition that a wife cannot testify against her husband without his permission and submitted that Mr. Tolen would not consent to his wife's testimony. With this as a basis the prosecutor again asked for a protective order against any defense questioning of Tolen concerning the alleged admission to his wife. Stating that he would permit defense counsel to cross-examine Mr. Tolen about his wife's statement to the police, the trial judge declined to issue the requested protective order. Specifically, the court ruled that defense counsel could go through the statement and ask Tolen whether or not he had made statements to his wife which were contained in the police reports.

Mr. Tolen was first questioned outside the presence of the jury. He denied making any admission to his wife about the murder and, in addition, asserted the privilege to prevent his wife from testifying as to the matter. Defense counsel then asked the court to rule on whether or not he could bring forth evidence of Mrs. Tolen's statement. The court stated that it would not require Mrs. Tolen to testify against her husband. Mr. Koziol subsequently made an offer of proof:

I will ask the witness whether he admitted guilt to his wife, killing Willie Wilson, whether in jest, or in seriousness. As I understand it he'll deny it. At this point I would like a stipulation from the state to the truth of these words, or—that the

---

12. Alaska Civil Rule 43(h)(1) provides:
*Marital Privileges.* A husband shall not be examined for or against his wife, without her consent, nor a *wife for or against her husband,* without his consent; nor can either, during the marriage or afterwards be, without the consent of the other, examined as to any communications made by one to the other during the marriage, but the exception does not apply to a civil action or proceeding by one against the other.
This privilege is made applicable in criminal cases by Alaska Criminal Rule 26(a), which states:
In all trials the testimony of witnesses shall be taken orally in open court, unless other-

wise provided by statute or by these rules. The admissibility of evidence shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by the principles of common law as they may be interpreted by the courts of the state in the light of reason and experience. In the absence of rule, the evidence shall be presented according to the most convenient method prescribed by common law principles, and the principle which favors the reception of the evidence shall govern. The competency and privileges of witnesses shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by common law principles.

fact that the words were said, or be allowed to call Carolyn Tolen and ask her the question. Now, I—as I understand the court's ruling, I'm not going to be allowed to prove these words either through calling her to the stand and ask her whether she said them, or asking her outright whether she said that about what her husband said to her. I understand the court's ruling is that I can merely ask the question and not support it. Is that the court's ruling?

The court responded in the affirmative. Mr. Koziol then stated that he would not ask Mr. Tolen any questions pertaining to the alleged admission because he would be unable to present evidence of the statement and he concluded that it would be unethical to ask a question which he could not support. Thereafter Mr. Koziol did not question Gary Tolen about the alleged admission and did not call his wife as a surrebuttal witness.

The Sixth Amendment to the United States Constitution provides in part that:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .

Article I, § 11, of the Alaska State Constitution provides a similar guarantee.

It is Salazar's contention that the limitation on his right to cross-examine Gary Tolen about the purported admission to his wife violated his right of confrontation. Specifically, he argues that

the effect of the trial court's ruling [with respect to the marital privilege] was to permit questioning of a witness who would "stonewall" the queries while denying to the cross-examiner the opportunity to prove the basis for his questions. Tolen's wife could not be called as a witness and the state would not stipulate to her statement. To allow counsel to ask whether the statement was made while denying counsel the right to make a

record from which to argue why the statement was made would invite the jury to believe counsel was engaged in a speculative and baseless attack on Tolen's credibility. Defense counsel declined the invitation. Acceptance would have been strategically unwise and ethically impermissible.[13]

The threshold question is whether the trial court's ruling with respect to the marital privilege was correct under the circumstances.

■ The judge's preliminary ruling was based on Criminal Rule 26(b)(2)(i), which provides:

(i) A husband shall not be examined for or against his wife, without her consent, nor a wife for or against her husband, without his consent.

Since Criminal Rule 26(b)(2)(i) applies only to one accused of a crime (the rule is entitled "Privileges of Accused"), and because Gary Tolen was not the defendant in the case, the trial court's ruling was obviously erroneous. There is, however, a similar privilege in Civil Rule 43(h)(1) which is made applicable to criminal cases by Criminal Rule 26(a).[14]

■ Alaska Civil Rule 43(h)(1) contains two distinct privileges, the adverse testimony privilege and the marital communications privilege. Clearly, since Gary Tolen was not a party the adverse testimony privilege is inapplicable. However, the State goes on to point out:

this confession of error [i. e., the judge erroneously ruled that the adverse testimony privilege was applicable] by the State does not end the inquiry. This court should affirm a trial court's exclusion of evidence if there existed any grounds for exclusion of the evidence, regardless of whether or not the lower court relied on the correct ground for the exclusion.[15]

---

13. Appellant's brief at page 79.

14. Alaska Civil Rule 43(h)(1) and Alaska Criminal Rule 26(a) are set forth fully in footnote 12.

15. Appellee's Brief, page 13, citing *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 722 n. 6 (Alaska 1975).

We hold that the marital communications privilege found in Civil Rule 43(h)(1) provides an appropriate basis for the exclusion of the evidence in this instance. We believe the State to be correct in its contention that Civil Rule 43(h)(1) provides an applicable marital communications privilege for Gary Tolen.

 In disputing the applicability of the privilege to the facts of this case, Salazar contends that confidentiality should be required for an invocation of this privilege, and that the record is devoid of any indication that the communication in question was confidential. However, as the State points out, marital communications are presumptively confidential,[16] and no evidence was introduced by Salazar to rebut this presumption. The marital privilege contained in Civil Rule 43(h)(1) is meant to protect those communications arising between the partners of a marital relationship that are confidential and not as a privilege for all communications irrespective of the circumstances surrounding their occurrence. While we recognize the presumption in favor of the existence of the privilege, we further recognize the policy underlying the privilege would not be fully satisfied if the presumption was not a rebuttable one—this in order to make the privilege as narrow as possible while fully protecting those communications which are confidential within a marital relationship.

While it appears that the facts of this case present a situation where the privilege would in most situations be properly claimed, we find this determination not to be dispositive of the matter. Rather, the question becomes whether the exercise of the privilege in this case conflicts with the defendant's right to meaningful confrontation under the Sixth Amendment of the United States Constitution as it has been interpreted in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

The *Davis* case, briefly stated, involved a protective order which prohibited the defense in a criminal case from questioning a witness concerning his juvenile record, so as to demonstrate possible pressure on the witness by the police. The trial court granted this motion based on a state provision which protected the anonymity of juvenile offenders. This court affirmed in *Davis v. State*, 499 P.2d 1025 (Alaska 1972). The United States Supreme Court reversed, holding the defendant's Sixth Amendment right of confrontation to be paramount to the State's policy interest in protecting the confidentiality of the juvenile's record. In discussing the importance of the refused testimony in *Davis*, the Court noted:

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided "a crucial link in the proof . . . of petitioner's act." The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, as well as of Green's possible concern that he might be a suspect in the investigation.[17]

 Courts must recognize the need on the part of the defendant to be allowed to fully cross-examine adverse witnesses. Here, the failure to allow Carolyn Tolen to testify effectively denied the defendant the ability to demonstrate the possible bias of Gary Tolen insofar as he may have been involved in the case. Further, Carolyn Tolen's testimony would have allowed the jury

---

16. *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1950), and *Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934), establish this principle for the federal system.

17. 415 U.S. at 317–318, 94 S.Ct. 1105–1111 (citations and footnotes omitted).

to question Tolen's prior inconsistent statement as well as enabled the defense to put forth an alternative theory of the subject crime. When, as in *Davis* and this case, the defendant's right to confront effectively the witnesses against him by exploring their possible bias or prejudice is balanced against a rule based solely on policy grounds, the defendant's constitutional rights must prevail. As the Court stated in *Davis:*

> The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness.[18]

The witness has no right to seek the court's protection from questions which would reveal any bias or prejudice. As the Court stated in *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931):

> [N]o obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked.

We thus hold that when conflict is found between the constitutional right of confrontation and the exercise of a privilege based on public policy, the constitutional right must control.

 We conclude that the case before us is controlled by the *Davis* decision and that the trial court erred in granting the protective order which prohibited Salazar from questioning Carolyn Tolen concerning Gary Tolen's statement to her that he had committed the murder.[19]

In this case, given the circumstantial nature of the evidence, the lack of motive by Salazar, the alibi defense, and the large number of possible suspects, it was of the utmost importance that the jury learn of the purported admission by Tolen. This is particularly important, for it was Tolen who offered the critical testimony concerning Salazar's prior knowledge of the location of the burned vehicle which linked Salazar to the crime scene. Under such circumstances the testimony was crucial.

In a criminal proceeding such as the one presently before us, society has charged the courts with the duty of being the functionary which remains ultimately responsible for assuring that each participant receives his or her day in court and accordingly has an opportunity to present his or her story to the trier of fact. Here that opportunity was denied to the defendant Salazar. The evidence presented to the jury was devoid of two existing, but excluded, evidentiary items which we find to be critical to the fact finder in its adjudication of the case against Salazar. Both the exculpating evidence from the absent officer, as well as the incriminating evidence against a party other than the defendant,[20] should have been presented to the trier of fact. To affirm this conviction, where the jury was denied critical testimony, would be to undermine our Constitution's commitment to the jury system, for such an affirmation would increase the likelihood of jury error, thus weakening the institution of the jury itself. Therefore, in order to guarantee that the fact finder will reach its decision of guilt or innocence based on all the available evidence, we REVERSE AND REMAND.[21]

---

**18.** 415 U.S. at 320, 94 S.Ct. at 1112.

**19.** While the statement was later characterized as somewhat in jest, this remains a determination for the jury.

**20.** In this regard *Davis*, 415 U.S. at 318, 94 S.Ct. at 1111 states:

Petitioner was thus denied the right of effective cross-examination which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." (Citations omitted)

**21.** We find it unnecessary to consider appellant's remaining five allegations of error.