**Robert R. ROSS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2476.**

Court of Appeals of Alaska.

June 26, 1992.

Linda K. Wilson, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Shelley K. Chaffin, Asst. Atty. Gen., Office of Special Prosecutions and Appeals,

Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

BRYNER, Chief Judge.

Robert J. Ross was convicted by a jury of one count of kidnapping and five counts of first-degree sexual assault. He later entered a plea of no contest to a separate charge of second-degree sexual assault. Superior Court Judge Peter A. Michalski sentenced Ross to consecutive sentences totalling eighty-four years' imprisonment. Ross appeals his kidnapping and first-degree sexual assault convictions, contending that the trial court erred in denying a continuance to allow Ross to find a missing defense witness. Ross also challenges his composite sentence as excessive. We affirm Ross' convictions but remand for further findings on his sentence.

Ross' convictions stem from two incidents that occurred approximately a week apart. On January 30, 1987, Ross met V.B. in a downtown Anchorage bar; at Ross' invitation, V.B. and several friends accompanied Ross to his nearby house for some beer. There, after V.B.'s friends left, Ross physically and sexually assaulted V.B.

On February 6, 1987, Ross approached S.A. in a downtown Anchorage bar, grabbed her arm, and commanded her to do as she was told. He forced S.A. to walk to his house. There, Ross held S.A. hostage for approximately eight hours, repeatedly subjecting her to physical and sexual assaults. In the early morning hours of February 7, S.A. managed to escape Ross' house and ran to the house of an acquaintance, William Jones. She woke Jones up, told him she had been raped, and asked for help. Jones went back to sleep, telling S.A. he would help her later. Afraid to go outside alone, S.A. remained at Jones' house. Later that afternoon, Jones awoke

and took S.A. to the home of her fiancé; S.A. immediately told her fiancé that Ross had raped her. Her fiancé took her to the hospital, where she was examined and reported the crime.

S.A.'s examination revealed that one of her front teeth had been broken out and that S.A. had suffered other physical injuries consistent with her claim of rape. The examining physician found semen in the area between S.A.'s vagina and rectum. Serology tests later established that the semen was consistent with Ross' semen. S.A. provided the police with an accurate description of Ross, showed them where he lived, and later identified him from a photographic lineup. A search of Ross' house yielded S.A.'s missing tooth.

For his January 30 assault on V.B., Ross was initially charged with three counts of first-degree sexual abuse. For his February 6-7 abduction and assaults on S.A., Ross was charged with kidnapping and five counts of first-degree sexual assault (three counts alleging acts of vaginal penetration and two of anal penetration).

The charges involving S.A. came on for trial before those involving V.B.[1] Ross' basic theory of defense was alibi. On October 27, 1987, as part of its case, the prosecution called William Jones as a witness. Jones confirmed that S.A. had awakened him early one morning. He testified that S.A. appeared to have two missing front teeth, a black eye, and bruises on her arms and legs. She was extremely upset and scared. S.A. asked for help, saying she had been raped. Jones stated that, after going back to sleep for awhile, he took S.A. to her fiancé's house.

After subjecting Jones to a perfunctory cross-examination, Ross' trial counsel indicated that he had no further questions at that time but wanted Jones held under subpoena for possible testimony during the defense case. The trial court told Jones

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. After being found guilty by a jury of the charges relating to S.A., Ross entered a plea of

no contest to a reduced charge of second-degree sexual assault for the incident involving V.B.; in exchange for the plea, the state dismissed the original charges.

that he was still under subpoena and that he should remain available to testify.

On November 4, 1987, six days after Jones testified as a prosecution witness, the state rested its case-in-chief. Ross' counsel then requested an overnight continuance, indicating that the delay was necessary because he had been unable to locate Jones, whom he now wanted to call as a defense witness. The trial court granted the continuance and adjourned court until the next day.

On the morning of November 5, Ross' counsel notified the court that Jones was still missing. An Alaska State Trooper who was in the courtroom described the efforts that the troopers had made to locate Jones since the court recessed the previous day. Those efforts included checking Jones' last known residence and all of the downtown Anchorage locations that he frequented, as well as contacting various Anchorage police officers who were acquainted with Jones and other individuals who knew him. All efforts had been unavailing. The troopers also followed up on a lead that Jones might have gone to Bethel; they transmitted a facsimile of Jones' subpoena to the Bethel Police Department and spoke by telephone to the Bethel Chief of Police, requesting assistance. The Bethel Police had been unable to locate Jones.

Ross' counsel then requested an additional continuance until November 9. He revealed that he expected Jones to impeach S.A.'s version of events. According to Ross' counsel, Jones would testify that, when S.A. came to his house, she appeared to have been drinking and did not say who had raped her. Ross' counsel also expected Jones to testify that, at some point before Jones took S.A. to her fiancé's house, Jones and she had sexual intercourse together.

Although the prosecution expressed skepticism concerning the materiality of Jones' proposed testimony, the trial court granted Ross a further continuance until November 9. On that day, however, Jones was still missing. Troopers and police had been unable to locate him or develop any significant leads as to his whereabouts, despite exhaustive efforts. Ross' counsel acknowledged that the defense had no idea where Jones might be or when he might be found.

Ross requested an additional continuance of several days. Alternatively, Ross moved for a mistrial due to Jones' unavailability. In support of these motions, counsel elaborated on the offer of proof that he had originally made, indicating that the offer was based on statements Jones had made to a defense investigator. Ross' counsel asserted that the proposed testimony would be relevant to discredit S.A.'s testimony that she was not intoxicated when she came to Jones' house and that she told Jones who had raped her. Ross' counsel also asserted the relevance of Jones' claim that he had sexual intercourse with S.A. at his house. According to counsel, this evidence might explain the presence of semen on S.A.'s person; counsel also asserted that S.A.'s claim of abduction and rape might seem less plausible to the jury if S.A. were shown to have engaged in consensual sex a short time after the alleged incident.

Judge Michalski denied Ross' motion for an additional continuance and his alternative motion for a mistrial. In so doing, the judge noted the exhaustive efforts that had been made to locate Jones, the lack of any information concerning Jones' current whereabouts, and the inability to predict when Jones might be located. Judge Michalski found that further delay might result in the need to declare a mistrial. Additionally, the judge noted that Jones' proposed testimony was, at best, impeachment evidence. Based on his observation of Jones' demeanor as a prosecution witness, Judge Michalski commented that his testimony was unlikely to carry much weight with the jury, in any event. Judge Michalski concluded that, under the circumstances, additional delay was unwarranted; the judge further found a mistrial inappropriate, since the uncertainty about Jones' whereabouts made it impossible to predict that Jones would be available to testify for the defense, even in the event of a retrial. On appeal, Ross contends that the trial

court erred in refusing to grant a further continuance or a mistrial.

 The trial court is vested with broad discretion to determine whether a mid-trial continuance should be granted in order to allow a party to secure the testimony of an absent witness. *See, e.g., Williams v. State,* 614 P.2d 1384, 1386 (Alaska 1980). In *Salazar v. State,* 559 P.2d 66 (Alaska 1976), the Alaska Supreme Court articulated seven criteria to guide the court in the exercise of that discretion:

(1) whether the testimony is material to the case;

(2) whether the testimony can be elicited from another source;

(3) whether the testimony is cumulative;

(4) probability of securing the absent witness in a reasonable time;

(5) whether the requesting party was diligent and acted in good faith;

(6) the inconvenience to the court and/or others;

(7) the likelihood that the testimony would have affected the jury's verdict.

*Id.* at 72.

 Under the *Salazar* criteria, the threshold question in this case is the materiality of Jones' proposed testimony. Jones would purportedly have testified that S.A. appeared to have been drinking and did not identify her assailant. Although this testimony would have tended to contradict S.A.'s trial testimony, thereby impeaching her credibility, the subject matter of the impeachment was essentially collateral to the principal issues raised in the case: whether S.A. had been abducted and raped and whether Ross was the person who had committed these offenses. As extrinsic evidence offered to impeach a witness on a collateral matter, the proffered testimony would have been of minimal materiality.

2. *See* AS 12.45.045.

3. *Compare, e.g., People v. Martinez,* 634 P.2d 26 (Colo.1981), *with State v. Williams,* 773 P.2d 1368 (Utah 1989).

4. Indeed, the record contains nothing to suggest that Jones' whereabouts were in fact discovered

Jones would also purportedly have testified that S.A. had consensual sex with him after coming to his house. Assuming that Alaska's rape shield statute [2] would not have barred the admission of this testimony for the purpose of establishing an alternative source for the semen discovered on S.A. during her medical examination,[3] the materiality of this aspect of Jones' testimony would have been greatly diminished by medical evidence indicating that the semen found on S.A. was compatible with Ross' semen. Ross failed to offer any comparable medical evidence establishing Jones as a possible source of the semen. Moreover, the state presented strong physical evidence (including S.A.'s broken tooth) corroborating S.A.'s version of the incident, and established that S.A. had identified Ross from a photographic lineup. Under the circumstances, the trial court could properly regard the materiality of Jones' proposed testimony as being limited, at best.

The second and third *Salazar* criteria have no significant bearing here, since both assume the materiality of the unavailable evidence: the fact that Jones' proposed testimony was not cumulative and was unavailable from alternative sources is inconsequential in light of its low materiality.

In contrast, the fourth *Salazar* criterion is of critical importance. Even if Jones' testimony had only slight probative value, a brief delay might have been warranted had there been some assurance of Jones' availability. Here, however, Jones' whereabouts remained completely unknown despite concerted efforts to locate him, and no significant leads had been developed. Under the circumstances, the trial court, having already granted two continuances for a total of five days' delay, had no reason to expect that any further delay—no matter how long or short—would have resolved the problem.[4]

at any time prior to Ross' sentencing, while jurisdiction of his case remained in the superior court and that court retained the power to grant a new trial. Similarly, there is nothing in the record to indicate that Jones has been located during the pendency of Ross' appeal or that he

All other things being equal, the fifth *Salazar* criterion—the diligence and good faith of the moving party—would tend to favor Ross in this case, since Judge Michalski expressly ordered Jones to remain available as a possible defense witness, and since Jones apparently violated the court's order. Even so, it is worth mentioning that Ross had the opportunity to elicit the proffered evidence during his cross-examination of Jones, but apparently elected not to do so for tactical reasons.

*Salazar*'s sixth criterion focuses on inconvenience to the court and others. In the present case, Judge Michalski expressed the well-grounded fear that additional delay would create a substantial risk of problems that might necessitate a mistrial. When balanced against the speculative prospects for locating Jones, this risk was certainly not insubstantial.

Finally *Salazar* requires consideration of the likelihood that Jones' testimony would have affected Ross' verdict. In large measure, the significance of this factor is governed by our conclusion concerning the materiality of the disputed testimony. The relatively low probative value of the proffered evidence, coupled with the strength of the physical evidence corroborating S.A.'s testimony, renders it highly unlikely that Jones' absence affected the outcome of Ross' trial, particularly in light of Judge Michalski's impression—based on his observation of Jones as a prosecution witness—that the jury was unlikely to give his testimony much credence.

In summary, our application of the *Salazar* criteria to this case convinces us that Judge Michalski did not abuse his discretion in denying Ross' third motion for a continuance.

Ross next challenges his sentence as excessive. At the time of his current offenses, Ross was 35 years of age. Ross had one prior felony: a 1982 conviction for first-degree sexual assault that involved circumstances similar to the assaults Ross committed against V.B. and S.A. For the earlier crime, Ross received an eight-year

would be available to testify in the event of a

term; he was on parole for that offense when he committed the current offenses.

For the incident involving S.A., Ross was convicted of kidnapping and five counts of first-degree sexual assault. Kidnapping, an unclassified felony, is punishable by a maximum term of 99 years and a minimum of five; the crime is not subject to presumptive sentencing. AS 11.41.300(c); AS 12.55.125(b). First-degree sexual assault, also an unclassified felony, is punishable by a maximum of thirty years; as a second felony offender, Ross was subject to presumptive terms of fifteen years for each of his first-degree sexual assault convictions. AS 11.41.410(b); AS 12.55.125(i)(3).

For the incident involving V.B., Ross was convicted of one count of second-degree sexual assault, a class B felony. He was subject to a four-year presumptive term for that offense. AS 11.41.420(b); AS 12.55.125(d).

Before imposing sentence, Judge Michalski found one aggravating factor applicable to all of the charges as to which Ross was subject to presumptive sentencing: that Ross was on parole when he committed the offenses. AS 12.55.155(c)(20). As to two of the first-degree sexual assault convictions, Judge Michalski found an additional aggravating factor: that Ross' conduct involved deliberate cruelty. AS 12.55.155(c)(2). Additionally, although presumptive sentencing did not formally apply to the charge, Judge Michalski found Ross' kidnapping to involve conduct among the most serious included in the definition of the offense. AS 12.55.155(c)(10).

In imposing sentence, Judge Michalski concluded that Ross was an extremely dangerous offender who had little chance for rehabilitation. The judge thus stressed the need to isolate Ross for the protection of the community. Judge Michalski sentenced Ross to fifty years for kidnapping. The judge imposed fifteen years for each count of first-degree sexual assault, making the two counts involving anal penetration concurrent to each other and the three counts involving vaginal penetration concurrent to each other, but ordering each

retrial.

group of concurrent sentences to be consecutive to the other group, as well as to the kidnapping. This yielded a total of eighty years' imprisonment for the offenses involving S.A.

For the second-degree sexual assault conviction involving V.B., Judge Michalski imposed an additional consecutive term of four years. Relying on Ross' dangerousness and the need to isolate him for the maximum possible time, Judge Michalski ordered that Ross' eligibility for discretionary parole be restricted on the kidnapping charge. Ross thus received a composite term of eighty-four years without possibility of parole.

On appeal, Ross does not challenge the aggravating factors Judge Michalski found applicable to his case. He argues, instead, that a composite term of 84 years is excessive for a second felony offender convicted of kidnapping and sexual assault. In response, the state argues that Ross' sentence is justified in light of his background and the seriousness of his current crimes. In our view, however, the sentencing court's findings are inadequate to allow resolution of this issue on appeal.

This court recently had occasion to conduct an extensive review of past sentencing decisions involving offenders simultaneously convicted of rape—or first-degree sexual assault—and kidnapping. *See Williams v. State*, 800 P.2d 955 (Alaska App.1990), *modified on reconsideration*, 809 P.2d 931 (Alaska App.1991). Our review indicated "a fair degree of uniformity" in sentencing in such cases. *Williams*, 800 P.2d at 958. We noted that the cases fell into three benchmark categories. The initial category consisted of first felony offenders. For offenders in this category, we observed that sentences exceeding twenty years of unsuspended time had rarely been approved. *Id.* at 959. The second benchmark category included kidnap/rape cases involving offenders who had one or more prior felony convictions but whose criminal history was not sufficiently extensive to place them in the dangerous offender category. As to this category, we found that "precedents firmly establish thirty years as the maximum composite sentence that should ordinarily be imposed...." *Id.* In the third benchmark category, we found "a handful of decisions" approving composite sentences of more than thirty years of unsuspended time; we observed that "[w]ithout exception, those cases have involved kidnappings of prolonged duration or offenders whose prior criminal histories established them as persistent, violent criminals." *Id.* at 960.

In a later opinion on reconsideration in *Williams*, we emphasized that these three benchmarks do not represent immutable sentencing limits: "Our benchmarks in *Williams* and other cases are not intended to be inflexible rules confining the permissible range of a sentence in a given case; rather, they are meant to act as historically-based starting points for individualized analysis...." *Williams v. State*, 809 P.2d 931, 933 (Alaska App.1991). Indeed, shortly after our initial decision in *Williams*, we found departure from the benchmarks justified, approving a forty-year composite sentence for a second felony offender in a particularly serious kidnap/rape case that involved three separate incidents and three different victims. *See Yearty v. State*, 805 P.2d 987, 996–97 (Alaska App.1991).

Our opinion on reconsideration in *Williams* nevertheless reaffirmed the fundamental need for consideration of historical sentencing practices—as reflected in benchmark sentences—in the sentencing process; we noted that this need springs from the legislature's concern with promoting sentencing uniformity and eliminating unjustified disparity—a concern the legislature expressed with "unmistakable clarity" in AS 12.55.005(1), which requires the sentencing court to consider "the seriousness of the defendant's present offense in relation to other offenses." *Williams*, 809 P.2d at 934. We concluded:

> At a minimum, ... the principle of reasonable sentencing uniformity requires a sentencing judge who decides that an offender deserves a sentence which is significantly different from sentences previously given to similarly situated offenders to expressly find some legitimate

basis for the difference—some basis related to 'legally relevant sentencing criteria.' That basis should be spelled out on the sentencing record, so that the defendant and a reviewing court can understand the reasons for the disparity.

*Id.* at 935 (citation omitted).

In the present case, Ross' composite sentence of eighty-four years without eligibility for parole vastly exceeds the second felony offender benchmark and, indeed, substantially exceeds even the sentences imposed in some of the cases falling within *Williams'* third benchmark category. Unlike other offenders in *Williams'* third benchmark category, Ross' criminal history—consisting of a misdemeanor conviction for driving while intoxicated and a single prior felony, albeit for a similar crime—is not so extensive as to qualify him as an habitual offender, *see, e.g., Contreras v. State,* 767 P.2d 1169, 1175 (Alaska App. 1989), and does not appear to "establish an ingrained, compulsive criminal pattern" of violent misconduct. *Schuenemann v. State,* 781 P.2d 1005, 1009 (Alaska App. 1989). And unlike other cases in the third benchmark category, Ross' kidnapping did not entail an extraordinarily lengthy abduction. *See, e.g., Morrell v. State,* 575 P.2d 1200, 1202–03 (Alaska 1978) (virtual enslavement of victim with repeated sexual assaults over eight days).[5]

Despite the seemingly unprecedented length of the composite term he imposed in this case, Judge Michalski failed to discuss the seriousness of Ross' conduct in relation to other similarly situated offenders. Although the judge gave general consideration to the sentencing criteria specified in *State v. Chaney,* 477 P.2d 441, 444 (Alaska 1970), he made no findings to explain the apparent disparity between Ross' composite sentence and sentences previously given to similarly situated offenders.

It seems to us that the aggravated nature of Ross' conduct and the disturbing similarity of his prior sexual assault make his case at least comparable to, and perhaps more serious than, *Yearty v. State.* We are thus inclined to think that a sentence exceeding *Williams'* second category benchmark of thirty years would be justified here, as was the case in *Yearty.* On the other hand, given Ross' limited criminal history, we are skeptical that a sentence placing Ross in the third benchmark category could be justified, particularly in light of the sketchy psychiatric information contained in the sentencing record.[6]

■ At this juncture, however, it would be premature for us to determine whether the sentence imposed below was excessive. *DeGross v. State,* 768 P.2d 134, 138 (Alaska App.1989). "A reviewing court cannot determine the appropriateness of a sentence where the sentencing court has failed to make adequate findings...." *State v. Bumpus,* 820 P.2d 298, 305 (Alaska 1991). Here, the sentencing court's failure to

---

**5.** Nor does Ross' conduct appear to have exposed his victims to the type of imminent, life-threatening danger that justified an exceptionally severe first-offense sentence of thirty years in *Wilson v. State,* 670 P.2d 1149, 1154 (Alaska App.1983). *See also Williams v. State,* 800 P.2d at 958.

**6.** The record contains a 1981 psychiatric evaluation prepared in connection with Ross' prior sexual assault case. The evaluation appears to have been based on an interview by a social worker to determine Ross' personal history, coupled with a single psychiatric interview. There is no indication that Ross was subjected to any psychological testing. Under the heading "diagnosis," the psychiatric evaluation lists alcohol abuse and antisocial personality disorder. Although the report discusses Ross' alcohol abuse problem extensively and makes specific recommendations for treatment thereof, it is virtually silent concerning the basis for diagnosing an antisocial personality disorder, the nature of the disorder, or its significance in terms of Ross' overall conduct. In his sentencing remarks, Judge Michalski did not make any specific reference to the psychiatric evaluation. On appeal, however, the state notes that Ross has been diagnosed as having an antisocial personality disorder and, apparently on this basis, argues that he has psychological problems justifying skepticism concerning his prospects for rehabilitation. In our view, however, it is questionable whether any significance should properly be ascribed to the psychiatric report's single, cryptic reference to a diagnosis of antisocial personality disorder.

make express findings concerning the seriousness of Ross' offenses in relation to other similar cases and the court's consequent failure to explain the apparent disparity of the sentence it elected to impose preclude meaningful appellate review. We must therefore remand this case for resentencing in light of *Williams*. On remand, the sentencing court should make express findings in conformity herewith.

The convictions are AFFIRMED. The sentences are VACATED, and this case is REMANDED for resentencing.

MANNHEIMER, J., not participating.