The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Nelson Joe MARTINEZ, Defendant-Appellant.

No. 80SA56.

Supreme Court of Colorado, En Banc.

Aug. 17, 1981.

As Modified on Denial of Rehearings Sept. 21, 1981.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., John Daniel Dailey, Asst. Atty. Gen., Litigation Section, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Harvey M. Palefsky, Deputy State Public Defender, for defendant-appellant.

LEE, Justice.

Defendant, Nelson Joe Martinez, was charged with first-degree sexual assault, section 18–3–402, C.R.S.1973 (1978 Repl. Vol. 8), and second-degree kidnapping, section 18–3–302, C.R.S.1973 (1978 Repl. Vol. 8). He was ultimately convicted of second-degree sexual assault, section 18–3–403, C.R.S.1973 (1978 Repl. Vol. 8),[1] and false imprisonment, section 18–3–303, C.R.S.1973 (1978 Repl. Vol. 8).[2] We reverse the conviction of second-degree sexual assault, and affirm the conviction of false imprisonment.

The alleged offenses took place on the evening of October 19, 1978, in Grand Junction. The testimony of the prosecutrix regarding the critical events of that evening conflicts with the defendant's statements made immediately after his arrest to the investigating police officer. The defendant elected not to testify at trial.

The prosecutrix, age 27, testified that she was in Grand Junction on business and, after a long day, she decided to stop at a night club called the "Suds N Sounds." Upon discovering that the establishment catered to the "under 21" crowd, she left, commenting to the doorman that she was "too old" for the place. The evidence diverges at this point.

Defendant claimed in his statement to the officer that he overheard the prosecutrix' comment as he was standing near the door at the time she left. He told her that he knew of a better night club and that if she would give him a ride, he would give her directions. A witness to the events which transpired at the "Suds N Sounds" corroborated in part defendant's version of what occurred in the parking lot of that night club. The defendant also stated that he and the prosecutrix then drove to a night club called the "Timbers." During the ride they had talked, but nothing unusual had happened. As he got out of the car at their destination, defendant stated that the prosecutrix said something about having him arrested and drove off. This was the last time he saw her.

The prosecutrix' testimony, on the other hand, indicated that as she left the "Suds N Sounds" and was walking to her rental car in the parking lot, the defendant suddenly appeared next to her, saying that he knew of a place where she could go and be served alcoholic beverages. She responded noncommittally at which point defendant told her that he was without a ride, and, if she would give him a ride, he would take her to the bar. She responded that she would give him a ride. She explained her conduct by stating that she had often picked up hitchhikers in her hometown, Aspen, and so was not reluctant to do that in this case. However, as they got closer to the car, the prosecutrix claims she changed her mind and decided to go back to her motel. At this point she told the defendant that she had changed her mind and would not give him a ride. Defendant then allegedly grabbed her arm, saying he didn't want to hurt her. He then guided her to the car and ordered her into the car.[3] She complied and defendant then got in on the passenger side. She told defendant she did not know the way to the bar and defendant responded that he would direct her where to go.

---

1. Section 18–3–403(1)(a), C.R.S.1973 (1978 Repl. Vol. 8) provides:

   "18–3–403. *Sexual assault in the second degree.* (1) Any actor who knowingly inflicts sexual penetration or sexual intrusion on a *victim commits sexual assault in the second degree if:*

   (a) The actor causes submission of the victim to sexual penetration by any means other than those set forth in section 18–3–402, but of sufficient consequence reasonably calculated to cause submission against the victim's will;"

2. Section 18–3–303, C.R.S.1973 (1978 Rep. Vol. 8) provides:

   "18–3–303. *False imprisonment.* Any person who knowingly confines or detains another without the other's consent and without proper legal authority commits false imprisonment, which is a class 2 misdemeanor. This section shall not apply to a peace officer acting in good faith within the scope of his duties."

3. The prosecutrix maintained throughout the trial that she is physically incapable of screaming.

They then drove around for about forty-five minutes during which time they "just talked." She testified that it never occurred to her to honk the horn of the rental car she was driving since the horn on her car at home was broken. At a couple of stoplights the prosecutrix claims she started to jump out of the car but was prevented by the defendant who grabbed her and told her again that he didn't want to hurt her. Finally, defendant directed her to a secluded spot, ordered her to disrobe, and raped her. The rape allegedly occurred in the front seat of the car. No physical evidence of the rape was recovered from the car. Defendant then had the prosecutrix drive back into town and drop him off at a bar in town. Being in fear of what defendant might do to her, she promised not to call the police.

A short time later, the prosecutrix, who was lost, asked a police officer on routine patrol for directions back to the airport where her motel was located. She did not report the attack to that officer. He testified that he saw nothing out of the ordinary in her appearance and that she did not appear upset or hurt. She returned to her motel, called her psychologist in Aspen, and subsequently called the Grand Junction rape crisis center. She then proceeded to a hospital for a medical examination and at this time she reported the rape to the police.

The doctor who examined her on the night of the alleged rape testified that he had examined the prosecutrix' clothes and found no signs of semen stains. He had, however, found sperm in her vaginal tract, five to ten percent of which had been live sperm. The doctor also testified that he had found an abrasion on the left labium minor which "rather strongly" suggested that non-consensual intercourse had occurred. There were no other injuries to the prosecutrix, nor were there any bruises on the right arm where the prosecutrix testified the defendant grabbed her. The doctor testified that the prosecutrix had appeared to be very upset at the time of the examination.

At the preliminary hearing, the prosecutrix admitted to having sexual intercourse with another man approximately twenty-four hours before the alleged assault. At trial, the court refused to allow questioning on this subject. See section 18–3–407(1)(b), C.R.S.1973 (1978 Repl. Vol. 8). However, the court did allow defense counsel to question the examining doctor about the possibility that the live sperm count could have been the result of a consensual sex act within the previous 24 to 36 hours. While the doctor did testify that it would be "exceedingly unlikely," he also testified that it was possible. His medical opinion was that, with the level of the live sperm count found in the prosecutrix' vaginal tract, there was a one to two percent chance that the semen could have been deposited twenty-four hours before his examination.

The defendant appeals his convictions of second-degree sexual assault and false imprisonment, citing errors in the instructions to the jury and the exclusion of evidence of the prior sex act by the prosecutrix.

I.

Defendant contends that the trial court erroneously instructed the jury as to the definition of the crime of second-degree sexual assault by omitting the statutorily required *mens rea* element—knowingly—from the instruction. See section 18–3–403, C.R.S.1973. Therefore, defendant asserts he is constitutionally entitled to a new trial on the charge of second-degree sexual assault. We agree.

■ It is clear that defendant must be proved guilty beyond a reasonable doubt of every element of the crime of which he is convicted. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Instructions which fail to define all the elements of an offense charged, so that a jury may decide whether they have been established beyond a reasonable doubt, are constitutionally deficient. *See People v. Hardin*, Colo., 607 P.2d 1291 (1980).

■ In the present case, the trial court properly instructed the jury on the defini-

tion of false imprisonment including the statutorily prescribed culpable mental state of "knowingly." *See* statute, *supra*, note 2. The court failed, however, to include the prescribed culpable mental state of "knowingly" in the definition of second-degree sexual assault. *See* statute, *supra*, note 1. The court also gave a separate general instruction that "to constitute a crime there must be the joint operation of an act forbidden by law and a culpable mental state." *Colo. J.I.* (Crim.) 6:1. By including the statutory *mens rea* in the definitional instruction of false imprisonment but omitting it from the definitional instruction of second-degree sexual assault, the jury was in effect instructed that the *mens rea* element must be proven beyond a reasonable doubt as to false imprisonment but not as to second-degree sexual assault. Since the *mens rea* element of "knowingly" was a statutorily prescribed element of second-degree sexual assault and the jury was not so informed, it

had no way of learning of its application to the assault count.

We have recently dealt with the adequacy of jury instructions which omitted the proper *mens rea* element of the offense charged. *People v. Hardin, supra; People v. Bridges,* Colo., 612 P.2d 1110 (1980) (*Bridges I*); and *People v. Bridges,* Colo., 620 P.2d 1 (1980) (*Bridges II*).[4] In our view *People v. Hardin, supra,* controls the disposition of the present case.

In *Hardin, supra,* the defendant was convicted of first-degree assault, second-degree assault, attempted criminally negligent homicide, and a crime of violence. The instruction problem on appeal arose in connection with the definitional instruction on first-degree assault. This court held the instructions on the crime of first-degree assault were insufficient because the trial court omitted the statutory *mens rea,* "knowingly," from its instruction on the elements of the substantive offense. In

4. In our view, neither *Bridges I* nor *Bridges II* controls the disposition of the present case.

In *Bridges I,* we dealt with instructions that were somewhat similar to those in the instant case concerning the second-degree assault count. The defendant in *Bridges I* was charged with and convicted of first-degree sexual assault, section 18–3–402, C.R.S.1973 (1975 Supp.); first-degree kidnapping, section 18–3–301, C.R.S.1973; and robbery, section 18–4–301, C.R.S.1973. We reversed the kidnapping conviction and affirmed the sexual assault and robbery convictions. Neither the first-degree assault statute nor the robbery statute at the time of those offenses prescribed a culpable mental state, as contrasted with the statute in the present case which prescribes the culpable mental state of "knowingly" as an element of the crime of second-degree sexual assault.

In *Bridges I,* it was recognized that "the basic definition of a crime usually requires the conjunction of an act and a culpable mental state," and that the "required mental state may be implied from the statute." The jury was instructed, apart from the definition of the crime instructions, that "to constitute a crime there must be a joint operation of an act forbidden by law and a culpable mental state." The instruction then defined "intentionally." We held that since the court had instructed the jury on the *mens rea* element of "intentionally," the defendant's rights had not been jeopardized when the instructions were considered as a whole. The convictions of first-degree sexual assault and robbery were affirmed.

In *Bridges II,* the defendant was charged with and convicted of engaging in a riot, section 18–9–104, C.R.S.1973; third-degree assault, section 18–3–204, C.R.S.1973 (1978 Repl. Vol. 8); and felony menacing, section 18–3–206, C.R.S.1973 (1978 Repl. Vol. 8). The defendant appealed from his conviction of engaging in a riot. As in *Bridges I,* the riot statute did not prescribe a culpable mental state. We followed the rule of *Bridges I* and stated that the culpable mental state of knowingly may be implied from the statute. At this point, however, the similarity of *Bridges I* and *Bridges II* ends.

While the trial court in *Bridges II* gave the standard instruction on the necessary co-existence of an act and a mental state, the court also instructed the jury on two alternate mental states: "specific intent" and "intentionally." The court limited the definition of "intentionally" to the felony of third-degree assault and the definition of "specific intent" to the felony menacing charge. The confusion in the court's instructions arose because the court failed to indicate what culpable mental state was an element of the felony of engaging in a riot. The jury consequently had no guidance as to what culpable mental state was required to be proved as an element of the riot charge. The instructions were therefore deemed deficient and reversal of the conviction of engaging in a riot was thus required.

a general instruction, the court had instructed that criminal liability attaches only when there is a co-existence of an act with a state of mind. *See Colo.J.I. (Crim.)* 6:1. However, the court then continued that instruction by defining several possible mental states. Thus, confusion existed as to the proper *mens rea* to be applied by the jury to the first-degree assault charge. We stated in *Hardin*:

"The instruction given at trial contained all of the elements of first-degree assault except the degree of mental culpability. [Footnote 2 omitted.] No objection was made to the instruction at trial, and the motion for a new trial did not raise the omission in the instruction as error. Where plain error or a defect affecting substantial rights appears, we should consider it even though it is raised for the first time on appeal. *People v. Morant*, 179 Colo. 287, 499 P.2d 1173 (1972). Therefore, we must consider whether the failure to instruct the jury on the requirement of "knowingly" was plain error or a defect affecting substantial rights. Crim.P. 52(b).

The due process clause of the United States Constitution protects the accused against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970). The requirement that the defendant act knowingly is an essential element of first-degree assault. Here, the jury was allowed to find defendant guilty of first-degree assault without necessarily finding that the requisite culpable mental state had been proven beyond a reasonable doubt.

It is the duty of the trial court to instruct the jury properly on all matters of law, *People v. Woods*, 179 Colo. 441, 501 P.2d 117 (1972), and 'the failure to do so with respect to the essential elements of the crime charged constitutes plain error.' *People v. Archuleta*, 180 Colo. 156, 159, 503 P.2d 346, 347 (1972). On its face, the instruction defining the elements of first-degree assault was lacking a crucial element. Therefore, we reverse defendant's conviction of first-degree assault and remand to the trial court for a new trial."

Under the rule of *Hardin, supra*, when a *mens rea* element is prescribed in the statute defining an offense, the court should always include the *mens rea* element in the definition of the crime instruction. If it does not do so, unless from all of the instructions taken as a whole the jury is clearly instructed as to the prescribed *mens rea* element, the instructions are constitutionally deficient. In the present case, since there was a failure to include the *mens rea* element in the definitional instruction of second-degree sexual assault and the instructions did not otherwise make clear what prescribed *mens rea* element was applicable to second-degree sexual assault, the conviction must be reversed.

II.

Since the case is remanded for a new trial on the second-degree sexual assault charge, we discuss the defendant's assertion that the court misapplied the provisions of the rape shield statute.

■ Defendant contends that the trial court prejudicially erred by refusing to allow defense counsel to ask the prosecutrix on cross-examination whether she had consensual sexual intercourse with someone other than the defendant within the twenty-four hour period immediately before the alleged assault. It was the defendant's theory of defense that he never had sexual intercourse with the prosecutrix. We hold that such evidence is relevant as bearing upon the credibility of the prosecutrix and the believability of her version of the events of that evening, and thus supports the non-guilt of the defendant.

At the preliminary hearing the prosecutrix admitted that she had engaged in sexual intercourse with another man approximately twenty-four hours before the alleged assault. It is the defendant's position that this testimony should have been admitted at trial because it explained the presence of the live sperm in the prosecutrix'

vaginal tract and supports his contention that he never had sexual intercourse with her.

The district court excluded the evidence as irrelevant and immaterial since the prior consensual sexual act did not take place within "an hour or two" of the alleged assault.[5]

■ The Colorado "rape shield" statute specifically excepts this type of evidence from its substantive and procedural provisions. Section 18–3–407(1)(b) and (2), C.R.S.1973 (1978 Repl. Vol. 8).[6] The evidence of a specific instance of sexual activity, offered to show the source or origin of semen is not precluded by the statutory presumption of irrelevance or the procedural safeguards which are given to other evidence of a prosecutrix' past sexual activity. Such evidence is subject only to the usual rules of evidence.

In our view, the trial court misconceived the application of the rape shield statute holding such evidence to be irrelevant and immaterial. Such evidence is relevant if it supports the defendant's claim of innocence. As stated in *Bush v. Jackson*, 191 Colo. 249, 552 P.2d 509 (1976), evidence is relevant if it renders the claimed inference more probable than it would be without the evidence. Evidence of a prior sexual act with another man which could explain the presence of semen in the prosecutrix' vaginal tract is relevant in that it tends to render more probable the inference that defendant did not have sexual intercourse with the prosecutrix.[7]

■ It is, of course, essential that an accused lay a proper foundation for the introduction of the evidence of the prosecutrix' prior sex act. If a defendant can show that the presence of the live sperm could have been the result of a specific previous act of sexual intercourse, evidence of such an act is admissible. *State v. Mastropetre*, 175 Conn. 512, 400 A.2d 276 (1978); *State v. Gibbons*, R.I., 418 A.2d 830 (1980); *Pack v. State*, 571 P.2d 241 (Wyo.1977); and *see People v. Mikula*, 84 Mich.App. 108, 269 N.W.2d 195 (1978) and *Annot.* 94 ALR3d 257. Here, however, the defendant's offer of proof was minimal which may be another reason for the court's ruling excluding the evidence.

### III.

In view of our reversal of the sexual assault count, we find it unnecessary to consider at length the defendant's other contentions for reversal. Suffice it to say, we have examined defendant's assertion of

---

**5.** The court's ruling on the proffered evidence was as follows: "Just so we won't have to keep coming back in here every time to reopen this, I am specifically ruling that any prior acts of sexual intercourse, and particularly the night before, is immaterial and irrelevant to any cross examination that you might have unless it was a prior act of intercourse with the defendant or *within a closely related time within an hour or two* from someone else, which would indicate that the semen was not deposited by the defendant, but by somebody else." (Emphasis added.)

The trial court apparently disagreed with the expert testimony because of the remoteness of the prior act of intercourse. Remoteness is a matter affecting the weight of such evidence and not its relevancy. Its weight is to be determined by the jury. Since the medical opinion concluded that the semen deposited twenty-four hours before the alleged assault could in fact have survived that period of time, the evidence was relevant to the defense that its presence was the result of the earlier act of intercourse.

**6.** Section 18–3–407(1)(b), C.R.S.1973 (1978 Repl. Vol. 8) provides:

"*Victim's prior history—evidentiary hearing.* (1) Evidence of specific instances of the victim's prior or subsequent sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall be presumed to be irrelevant *except*:
* * *
(b) *Evidence of specific instances of sexual activity showing the source or origin of semen*, pregnancy, disease, or any similar evidence of sexual intercourse offered *for the purpose of showing that the act or acts charged were or were not committed by the defendant.*" (Emphasis added.)

**7.** If defendant were claiming the prosecutrix consented to sexual intercourse then this evidence would be subject to the rules of section 18–3–407, C.R.S.1973, since the evidence would not fall within the exception to those rules.

error relating to the court's denial of defendant's tendered instructions, and we find this contention to be without merit. We also find no merit in the contention that the trial court erred in unduly restricting defense counsel's voir dire examination.

## IV.

■ The defendant for the first time on appeal has attacked the constitutionality of the second-degree sexual assault statute, section 18–3–403(1)(a), C.R.S.1973 (1978 Repl. Vol. 8), contending that the statute is vague, and that it violates due process and equal protection. As has so often been said, we will not consider these issues since they were not presented to the trial court and properly preserved for appellate review. *People v. Davis*, 194 Colo. 466, 573 P.2d 543 (1978); *People v. Pickett*, 194 Colo. 178, 571 P.2d 1078 (1977); *People v. Carr*, 185 Colo. 293, 524 P.2d 301 (1974); *Valley v. People*, 165 Colo. 555, 441 P.2d 14 (1968), *cert. denied*, 393 U.S. 925, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968).

## V.

■ The defendant's appellate attack is principally directed toward the validity of the conviction of second-degree sexual assault. Nowhere does he with any particularity, attack the conviction of false imprisonment. From our review of the record we find no persuasive reason to reverse that conviction. The court's instructions to the jury on that charge are complete and proper. We have not found the evidence in the record in support of that charge to be insufficient. Reversal on the sexual assault count does not mandate reversal on the false imprisonment count since the prejudicial errors causing the reversal relate only to the sexual assault charge.

The judgment of conviction of false imprisonment is affirmed.

The judgment of conviction of second-degree sexual assault is reversed and the cause remanded for a new trial on that charge.

HODGES, C. J., does not participate.