The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Richard Juan MASCARENAS,
Defendant-Appellee.

The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Richard MASCARENAS,
Defendant-Appellant.

Nos. 80SA201, 81SA385.

Supreme Court of Colorado,
En Banc.

June 20, 1983.

As Modified on Denial of Rehearing
July 11, 1983.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Laura E. Udis, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Robert L. Russel, Dist. Atty., David H. Zook, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

J. Gregory Walta, Colorado State Public Defender, James England, Deputy State Public Defender, Denver, for Mascarenas.

ERICKSON, Chief Justice.

These consolidated appeals involving the same defendant raise similar issues under Colorado's Uniform Mandatory Disposition of Detainers Act, sections 16–14–101 to 108, C.R.S.1973 (1978 Repl.Vol. 8). In the El Paso County case, 80SA201, the prosecution appealed the district court's dismissal of charges against the defendant for failure to comply with the ninety-day speedy disposition provisions of the Detainers Act. We affirm the ruling of the district court. In the Weld County case, 81SA385, the defendant appealed his convictions for aggravated robbery of drugs and two counts of habitual criminality on several grounds, including the prosecution's failure to comply with the Detainers Act. We reverse in part, affirm in part, and remand to the district court for a new trial.

I.

The defendant, Richard Juan Mascarenas, was arrested in Weld County for the armed robbery of a Greeley, Colorado pharmacy owned by Thomas Cole. Cole was working in the store on the afternoon of April 22, 1978, when two men wearing ski masks and wielding a sawed-off shotgun and pistol threatened to kill him if he did not produce money and drugs. After complying with the demands, Cole and two other employees were locked in a back room while the robbers fled. Cole went to a window in time to see the two men jump into a white-over-dark brown or black Pontiac Bonneville and drive away. He immediately called the police and gave a description of the robbers and their vehicle.

The police issued a general bulletin, warning of the fleeing robbers. Officer Michael Goeke, a Weld County Deputy Sheriff who lived south of Greeley, heard the police broadcast. The broadcast described the robbers as a caucasian male and a black male, armed with a sawed-off shotgun and handgun, and escaping in a white-over-black vehicle. Officer Goeke knew that several recent robberies in the Boulder, Colorado area had been committed by two men—one white and one black. Goeke suspected that the fleeing robbers might be the same men and positioned himself on the highway south of Greeley toward Boulder. Several minutes later, Goeke observed a white-over-black vehicle. Although there was only one person visible in the car, who was later identified as the defendant, Richard Mascarenas, Goeke and an assisting officer stopped the car to investigate. While waiting for the driver to produce some identification, they noticed a passenger sleeping in the back seat. Both men were ordered out of the car and escorted away from the vehicle.

Officer Goeke, while checking the car for additional passengers, noticed a sawed-off shotgun on the front seat. He immediately placed the driver and passenger under arrest for possession of an illegal weapon and conducted a search incident to the arrests. While checking the trunk of the vehicle he noticed a ski mask and a woman's nylon stocking along with some other clothing.

After the arrest procedures were completed, Cole and the other two victims of the robbery were brought to the arrest site for possible identification of the suspects. Cole testified that upon arrival he saw a Pontiac matching his description of the getaway car and was shown a sawed-off shotgun which he identified as the weapon used against him. Cole also identified Richard Mascarenas.

The defendant was charged in Weld County with aggravated robbery of drugs. After pleading not guilty by reason of insanity, he was transferred to the Colorado State Hospital in Pueblo for a sanity examination. On the return trip to Weld County, he and two other prisoners escaped. The escape led to the filing of charges for escape, kidnapping, aggravated robbery, and crime of violence in El Paso County. Two habitual criminal counts were later added to the information.

The defendant was finally arrested in the State of Washington in February of 1979. After waiving extradition, he was returned to Colorado and placed in the Jefferson County Jail, where detainers were lodged against him by the sheriffs of both El Paso and Weld Counties. Pursuant to section 16–14–102 of the Uniform Mandatory Disposition of Detainers Act, Mascarenas wrote the district courts for both counties requesting a final disposition of the charges pending against him. The El Paso County District Court immediately forwarded the defendant's request to the district attorney for El Paso County and issued an order directing the prosecution "to take appropriate steps to bring this defendant to trial." The clerk of the Weld County District Court did not forward the request.

Eventually the defendant moved for a dismissal of all charges pending against him in both Weld and El Paso Counties for failure to comply with the speedy disposition provisions of the Detainers Act. His motion was granted as to the charges pending in El Paso County and the prosecution appealed in 80SA201. The motion was denied as to the charge in Weld County for aggravated robbery of drugs and the defendant was subsequently tried and convicted on that count as well as on two habitual criminal counts. The defendant has challenged those convictions in 81SA365.

## II.

These appeals involve different factual settings relating to the application of the Uniform Mandatory Disposition of Detainers Act, sections 16–14–101 to 108, C.R.S. 1973 (1978 Repl.Vol. 8). In the El Paso County case, Mascarenas mailed a final disposition request to the El Paso County district court which was then forwarded by the court to the El Paso County district attorney. In the Weld County case, Mascarenas again mailed his request to the district court; that court, however, failed to forward the request to the district attorney's office.

### A.

Section 16–14–102 provides that any person in the custody of the department of corrections may request a final disposition of any pending untried indictment, information, or criminal complaint by writing the appropriate court and prosecuting official.[1] The prosecution then has ninety days after receipt of the request to bring the untried matters to trial.[2] The Act allows prisoners the opportunity to "clear the slate" of outstanding cases so that prisoners embarking on rehabilitation programs within the State's correctional institutions will not be continually disrupted by ongoing prosecutions. *See United States v. Dobson,* 585 F.2d 55, 60 (3d Cir.1978).

In the El Paso County case, the district court dismissed the charges because the prosecution failed to bring the action within ninety days of notification and because the prosecution acted in bad faith by adding

---

1. Section 16–14–102, C.R.S.1973, provides:
 "(1) Any person who is in the custody of the department of corrections pursuant to section 16–11–301 or parts 1 and 2 of article 13 of this title may request final disposition of any untried indictment, information, or criminal complaint pending against him in this state. The request shall be in writing addressed to the court in which the indictment, information, or criminal complaint is pending and to the prosecuting official charged with the duty of prosecuting it and shall set forth the place of confinement."

2. Section 16–14–104, C.R.S.1973, provides:
 "Within ninety days after the receipt of the request by the court and the prosecuting official, or within such additional time as the court for good cause shown in open court may grant, the prisoner or his counsel being present, the indictment, information, or criminal complaint shall be brought to trial; but the parties may stipulate for a continuance or a continuance may be granted on notice to the prisoner's attorney and opportunity to be heard. If, after such a request, the indictment, information, or criminal complaint is not brought to trial within that period, no court of this state shall any longer have jurisdiction thereof, nor shall the untried indictment, information, or criminal complaint be of any further force or effect, and the court shall dismiss it with prejudice."

additional criminal charges a short time before trial. The prosecution contends that the defendant is not entitled to invoke the Act because he failed to comply strictly with the Detainers Act. In our view, the El Paso County district court did not abuse its discretion by dismissing the charges and, accordingly, we affirm the ruling.

■ The defendant was in the legal custody of the department of corrections at the time his requests were made. Mascarenas was on parole for prior convictions when he was arrested in Weld County. Parole was revoked after the Weld County charge was filed. We have held that a person placed on parole remains in the legal custody of the department of corrections for the term of his sentence. *People v. Salvador,* 189 Colo. 181, 539 P.2d 1273 (1975); *Schooley v. Wilson,* 150 Colo. 483, 374 P.2d 353 (1962); *see also* sections 17–2–206 and 207, C.R.S.1973 (1982 Supp.). The defendant was therefore in custody for purposes of the Act and was entitled to invoke its provisions.

Mascarenas sought to invoke the Detainers Act by mailing a request to the El Paso County district court. The Act also requires that the request be delivered to the prosecuting attorney and the superintendent of the institution where the prisoner is confined. Sections 16–14–102 and 103. Mascarenas' request was subsequently delivered to the El Paso County district attorney, although no request was ever delivered to the superintendents of the institutions in which he was confined.

■ It is apparent that the prosecutors in this case had actual notice of Mascarenas' attempt to invoke the Act. Nevertheless, the prosecution did not act on the request and cannot now claim that they were improperly notified pursuant to the Detainers Act. Where a prisoner has substantially complied with the provisions of the Act *and* the prosecution has actual notice of the prisoner's request, it is not an abuse of discretion for the trial court to dismiss pending charges under the Act. The court shall dismiss the charges with prejudice if the prisoner complies with the act and the cause is not brought to trial within ninety days. Section 16–14–104, C.R.S.1973 (1978 Repl.Vol. 8).

In view of our interpretation of the Detainers Act, we need not address the issue of prosecutorial bad faith.

### B.

■ The Weld County case poses a significantly different factual pattern. The defendant proceeded under the Detainers Act by mailing a request for speedy disposition to the Weld County district court. Unlike the El Paso County case, the request was not forwarded to the prosecuting official and notice was not given until the day of the trial. Despite the defendant's interest in invoking the Act, seven hearings involving the case were conducted after his request was mailed. Four of the hearings involved motions for continuance filed by the defendant. The defendant neither mentioned nor invoked the Act at any of the hearings.

■ In our view, the defendant failed to comply with the minimum requirements of the Act and is not entitled to its final disposition provisions. The clerk of the Weld County Court is not obligated to forward speedy disposition requests; that duty is placed on the person invoking the terms of the Act. Although substantial compliance may be appropriate under certain circumstances, as in the El Paso County situation above, we cannot interpret the Act to allow the minimal attempts found here. Moreover, the defendant effectively waived his rights to final disposition within the ninety-day statutory limitation period by his active participation in the trial setting delays and in his agreement to the appropriate dates. *See People v. Fetty,* 650 P.2d 541 (Colo.1982); *Harrington v. District Court,* 192 Colo. 351, 559 P.2d 225 (1977) (waiver can be found from counsel's affirmative conduct in setting court dates). *See also Chambers v. District Court,* 180 Colo. 241, 504 P.2d 340 (1972); *State v. Carlson,* 258 N.W.2d 253 (N.D.1977). We further note that Mascarenas was represented by counsel throughout the pretrial period and

could have easily cured any defects in his request under the Detainers Act. We agree with the trial court's determination that allowing the Act to be invoked in the situation here would amount to "trial by ambush."

### III.

The following sections resolve allegations of error in the Weld County action. For the reasons set forth below, we reverse the conviction and remand the case for a new trial on the charge of aggravated robbery of drugs and on the habitual criminal charges.

The defendant argues that he is entitled to a new trial because the district court erroneously instructed the jury on the mental state required for the crime of aggravated robbery of drugs. We agree.

 The statutory definition of aggravated robbery of drugs does not specify the mental state necessary for the "taking" element of the crime. Section 18–4–303, C.R.S.1973 (1978 Repl.Vol. 8). Offenses which have their bases in the common law must nevertheless be construed to require a culpable mental state. *See Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96

L.Ed. 288 (1952); *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *People v. Naranjo,* 200 Colo. 1, 612 P.2d 1099 (1980); *People v. Washburn,* 197 Colo. 419, 593 P.2d 962 (1979). Because aggravated robbery of drugs is merely a variant of the common law crime of aggravated robbery, a culpable mental state is a requisite element of the crime. *People v. Smith,* 620 P.2d 232 (Colo. 1980).

 The trial court instructed the jury that a culpable mental state is a necessary element of any crime and that the mental state for aggravated robbery is "knowingly" as defined by the court's instructions.[3] While such an instruction is normally sufficient, *People v. Naranjo, supra,* it was inadequate because of the confusion created by the court's other instructions.

In Instruction 9,[4] the court advised the jury that the defendant must have "knowingly" placed the victim in reasonable fear of death or bodily injury. Based on that instruction, the jury could have assumed that the culpable mental state of "knowingly" described in Instruction 11 was only necessary with respect to the element of

**3.** *Instruction No. 11*

"To constitute a crime there must be the joint operation of an act forbidden by law and a culpable mental state of the defendant. A culpable mental state means knowingly as the term is explained in this instruction.

"The culpable mental state is just as much an element of the crime as the act. The culpable mental state must be proven beyond a reasonable doubt, as a matter of fact, either by direct or circumstantial evidence. The culpable mental state may be manifested by the circumstances connected with the perpetration of the offense and the sound mind and discretion of the defendant.

"Commission of the act alone does not warrant the presumption that the defendant had the requisite culpable mental state.

" 'Knowingly.' A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person acts knowingly with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."

.

**4.** *Instruction No. 9*

"A person commits the crime of aggravated robbery of narcotic drugs if:

"He takes any narcotic drug from any pharmacy or other place having lawful possession by the use of force, threats or intimidation, and during the act of robbery, or immediate flight therefrom, is armed with a deadly weapon, and who by the use of force, threats or intimidation, knowingly puts the person robbed or any other person in reasonable fear of death or bodily injury.

"The elements of aggravated robbery of narcotic drugs are therefore:

(1) Taking any narcotic drug;

(2) From pharmacy or other place having lawful possession

(3) By the use of force, threats or intimidation; and

(4) During the act of robbery or the immediate flight therefrom the defendant is:

(a) armed with a deadly weapon, and

(b) by the use of force, threats or intimidation puts the person robbed or any other person knowingly in reasonable fear of death or bodily injury."

placing the victim in fear of death or bodily injury. It was not clear that the taking element also required the same mental state. The confusion was compounded by the prosecuting attorney's statement during closing argument that: "[W]e don't even have to prove this guy knew he was stealing narcotic drugs. All we have to prove is that he did steal narcotic drugs."

Under the instructions given by the trial court, the jury could have concluded that the prosecution did not have to prove a culpable mental state for the taking element. The instructions adversely affected the substantial rights of the defendant and cannot be considered to be harmless error under the circumstances existing in this case. See Connecticut v. Johnson, —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983); People v. Martinez, 634 P.2d 26 (Colo.1981). Accordingly, we reverse and remand to the district court for a new trial. We will address the remaining issues raised by the defendant for the benefit of the district court and the parties on remand.

### IV.

The defendant moved to suppress all evidence obtained from the investigatory stop as fruit of an illegal stop. We affirm the trial court's denial of the motion.

■ An investigatory stop is permissible when the police have a reasonable and articulable suspicion based on specific, objective facts that an automobile or its occupants have been engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); People v. Hazelhurst, 662 P.2d 1081 (Colo.1983); People v. Smith, supra; Stone v. People, 174 Colo. 504, 485 P.2d 495 (1971). Some of the factors to be considered in making this determination are:

"(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in some criminality of the type presently under investigation."

3 W. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.3, at 84 (1979).

■ In the present case, Officer Goeke knew from the police broadcast that one black and one white male were fleeing the scene of an armed robbery in Greeley in a white-over-black vehicle. Knowing that two men with a similar modus operandi were suspected of the commission of crimes in the Boulder area, Goeke positioned himself on the road south of Greeley, toward Boulder, near the town of Platteville. Approximately fifteen to twenty minutes after the initial broadcast, Goeke observed a vehicle matching the one described. This was consistent with the amount of time normally required to travel the seventeen miles from Greeley to Platteville, a fact judicially noticed by the trial court at the suppression hearing. These facts were sufficient to support a reasonable and articulable suspicion that the defendant or his vehicle had been involved in criminal activity. Hence, the officers were justified in stopping the defendant for the purpose of conducting a limited investigation.

Although the number and description of the occupants in the car did not exactly match that given in the broadcast, the officers still had sufficient information to make an investigatory stop. During a field stop,

"[a]ccount must be taken of the possibility that by a change of circumstances or efforts of concealment some aspects of the description may no longer be applicable.... [W]hen the crime was committed by a group of a certain size, it makes no sense to suggest that only groups of that size may be stopped for investigation. The group may have split up immediately after completion of the crime or, if traveling by car, may be partially concealed from view."

3 W. LaFave, *supra,* at 88–89. *See also United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980); *People v. Smith, supra.*

Determining whether a stop is justifiable involves a balancing of interests. The reasonable suspicion standard was developed in recognition that some citizen/police encounters are not intrusive enough when measured by the Fourth Amendment to require the existence of probable cause:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be essence of good police work to adopt an intermediate response." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1971).

*People v. Smith,* 620 P.2d at 236. In our view, the facts relied upon by the officers in the present case were sufficient to justify stopping the defendant's vehicle in light of the limited nature of the intrusion and the importance of the governmental interest at stake. Therefore, upon remand, the evidence obtained as a result of the investigatory stop is admissible.

V.

The defendant argues that the trial court erred in admitting testimony concerning an out-of-court identification made under unreliable and suggestive conditions. We remand to the district court for a determination of whether the procedures in this case were unnecessarily suggestive under the factors set forth in *People v. Smith,* 620 P.2d 232 (Colo.1980).

One-on-one showups are not *per se* violative of due process, although the procedure is viewed with disfavor because of its strong potential for unnecessary suggestiveness. *See People v. Smith, supra; People v. Williams,* 183 Colo. 241, 516 P.2d 114 (1973). Often, however, the police need a quick determination of whether they

should continue searching for armed and dangerous felons. Witness identification at the scene of a crime or, as here, at the place where suspects are detained is permissible in situations where immediate identification would facilitate an ongoing criminal investigation. As we said in *People v. Williams,* 183 Colo. 241, 244–45, 516 P.2d 114, 115 (1973) (quoting *Bates v. United States,* 405 F.2d 1104, 1106 (D.C.Cir.1968)):

"[T]he police action in returning the suspect to the vicinity of the crime for immediate identification ... fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh."

Thus, the procedure employed in this case, while not preferable to more carefully controlled lineup procedures utilized at the station house, was reasonable under the circumstances. The reasonableness of the showup procedure, however, must also be measured against the potential for irreparable misidentification.

The test for determining whether a particular showup violates a defendant's due process rights is whether, under the totality of the circumstances, the identification was unreliable because the confrontation was unnecessarily and irreparably suggestive. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1976); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The following factors are relevant in making this determination: (1) The witnesses' opportunity to observe the criminal at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *People v. Smith, supra.* "Against these factors is to be weighed the corrupting effect of suggestive identification itself." *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253.

The eyewitness, Thomas Cole, identified Mascarenas by observing the defendant's eyes, height, weight, build, and clothing. He stated at the suppression hearing that "you just don't forget a guy with a shotgun and his eyes staring at you telling you he's going to blow your head off." Cole also had an opportunity to identify Mascarenas' partner at the showup. That identification was facilitated by the other person's distinctive clothing—in particular, "burnt orange" pants. Additionally, Cole testified that he recognized the escape vehicle and the sawed-off shotgun which were at the scene of the showup. While the identification of the other person and objects is not dispositive of any claims involving Mascarenas' identification, it does give added weight to the reliability of Cole's observations at the showup. In the context of this case, Cole may well have had a sufficient basis to identify Mascarenas as the robber.

The record, however, discloses some uncertainty on the part of Cole in making the identification and that the trial court failed to consider the factors which we set forth in *People v. Smith, supra.* Accordingly, we remand the identification issue to the trial court for findings based on the relevant factors. The court must determine whether Cole's identification was reliable in view of the potentially corrupting influences of unnecessarily suggestive procedures. *See People v. Mack,* 638 P.2d 257 (Colo.1981). If the court concludes that the identification was unreliable, the evidence must be excluded at retrial.

### VI.

The defendant has raised several issues involving his conviction as a habitual criminal. The habitual criminal conviction must be reversed because we have reversed the conviction for the substantive offense on which the charge was based. The prosecution, however, is entitled to bring habitual criminal charges against Mascarenas again on remand and we therefore address the defendant's remaining contentions which arose from the Weld County convictions.

### A.

First, the defendant argues that the prosecution's evidence on the element of identity was insufficient as a matter of law. We disagree.

In any habitual criminal action the prosecution bears the burden of proving beyond a reasonable doubt that the accused is the person named in the prior convictions. *O'Day v. People,* 114 Colo. 373, 166 P.2d 789 (1946). In the present case, the prosecution's evidence of prior convictions consisted of (1) certified copies of two judgments of conviction from the records of the Denver District Court; and (2) the defendant's prison record which included his photographs, fingerprints, and physical description and copies of the Denver District Court judgments of conviction.

The photographs and physical description in the prison record adequately established that the defendant was the same person described in the documents. The documents contained the defendant's identification number, name, fingerprints, and a description which included his age, height, weight, nationality, race, build, complexion, and identifying marks consisting of the two tatoos and various scars. Additionally, the defendant's prison number appeared on both his photographs and the first mittimus, and the second mittimus made reference to the first. The jury was able to compare the abundance of documentary evidence with the evidence of the defendant's name, age, and appearance adduced at trial in reaching its conclusion. *See State v. Brezillac,* 19 Wash.App. 11, 573 P.2d 1343 (1978); *State v. Baca,* 102 Ariz. 83, 425 P.2d 108 (1967). Based upon the evidence, the jury could have found beyond a reasonable doubt that the defendant was the person named in the prior convictions. Therefore, the prosecution's evidence was legally sufficient.

## B.

The defendant has also alleged that the unnecessary inclusion of a prejudicial document in his prison records constitutes error. A county court mittimus indicating that a Richard Juan Mascarenas was examined on a charge of child abuse and sentenced to ninety days in the county jail appeared in the defendant's prison records at trial. Because it was entirely unrelated to the alleged prior convictions upon which the prosecution based its habitual criminal charges, the document was irrelevant and should have been excluded. *See* Colorado Rules of Evidence 401; *People v. Quintana,* 665 P.2d 605 (Colo.1983).

## C.

Prior to trial, the defendant moved to dismiss the habitual criminal counts because the prior convictions on which the counts were based had not been "separately brought and tried" as required by section 16–13–101(1), C.R.S.1973 (1982 Supp.). Section 16–13–101(1) provides that a person "twice previously convicted upon charges separately brought and tried" which arise out of "separate and distinct criminal episodes" committed within a ten year period may be adjudged a habitual criminal. The defendant argues that the statute requires that the crimes on which the habitual criminal charges are based occur sequentially; in other words, that the second crime be committed after the commission and conviction of the first crime.

We resolved the same issue in *Gimmy v. People,* 645 P.2d 262 (Colo.1982), where we held that the statutory language compelled a conclusion that the charges be "separately 'brought'—*i.e.,* in separate informations, with separate docket numbers, arising out of separate criminal incidents" and not that each charge be concluded with a conviction before the next crime is committed. *Id.* at 267. The holding of *Gimmy* is sound and, accordingly, we reject the defendant's contentions that the habitual criminal charges should have been dismissed prior to trial.

## D.

The defendant also argues that his habitual criminal conviction was improperly based upon a prior judgment of conviction entered *nunc pro tunc.* On December 22, 1976, the defendant was convicted of a felony in Denver district court. The judgment of conviction, however, was not signed by a district court judge until June 7, 1978, two months after the Weld County robbery, when the judgment was entered *nunc pro tunc.* The defendant objected to the use of a *nunc pro tunc* entry to enable the prosecution to enhance punishment in criminal cases through habitual criminal charges, especially in a situation where, as here, the entry is made after the commission of the substantive crime which serves as the basis for the charges of habitual criminality. Thus, Mascarenas contends that one of the offenses with which he was charged and which formed a predicate for the habitual criminal charge was improperly alleged in the information brought in Weld County. Consequently, he argues that he had not been twice convicted of charges separately brought and tried as required by the habitual criminal statute, section 16–13–101(1), C.R.S.1973 (1982 Supp.).

The *nunc pro tunc,* or "now for then," entry is normally made to correct an omission from the court records. *See Black's Law Dictionary* 1218 (4th ed. 1968); *Dill v. Denver,* 37 Colo.App. 75, 541 P.2d 1272 (1975). *See also Frisco v. Brower,* 171 Colo. 441, 467 P.2d 801 (1970) (public officials presumed to discharge duties properly). Here, the change in the records was made to correct errors or omissions in the trial court's records and was in no way prejudicial to the defendant. The defendant's prior conviction was effective on the date of conviction—December 22, 1976—and, accordingly, the prosecution properly brought habitual criminal charges based on the Denver County district court conviction.

## E.

The defendant's final contention is that the trial court erred by failing to instruct the jury on the specific elements of a habit-

ual criminal charge. The trial court instructed the jury as follows:

"The defendant is charged with having previously been convicted of two separate felony offenses within the last ten years. Specifically, it is alleged that the defendant was convicted of the felony offense of Second Degree Burglary on the 23rd day of February, 1976 in Denver County, Colorado, and was also previously convicted of the felony offense of Menacing with a Deadly Weapon on the 22nd day of December, 1976, in Denver County, Colorado."

■■■ We have repeatedly held that proof of identity is an element of a habitual criminal prosecution. *DeGesualdo v. People,* 147 Colo. 426, 364 P.2d 374 (1961); *O'Day v. People, supra; Smalley v. People,* 116 Colo. 598, 183 P.2d 558 (1947). *See also* sections 16–13–103(1) and (4), C.R.S.1973 (1982 Supp.). The requirement of strict proof by the prosecution that the accused is the person named in the prior convictions would be rendered meaningless if the jury were not specifically instructed on the need to prove the defendant's identity beyond a reasonable doubt. As we stated in *Gonzales v. People,* 166 Colo. 557, 559, 445 P.2d 74, 75 (1968), "[w]ithout proper instructions, the jury does not have the necessary guidance to consider the evidence presented to it." The instruction given by the trial court here does not adequately advise the jury on the identity element and thus constituted reversible error. *See In re Winship, supra; Gonzales v. People, supra.* Although this issue was not raised by the defendant in his motion for new trial, it rises to the level of plain error and is properly addressed for the first time on appeal. *People v. Mattas,* 645 P.2d 254 (Colo.1982); *People v. Martinez, supra; People v. Archuleta,* 180 Colo. 156, 503 P.2d 346 (1972); *People v. Morant,* 179 Colo. 287, 499 P.2d 1173 (1972).

## VII.

The defendant's final claim of error is that the prosecution failed to establish a chain of custody from arrest to admission at trial of narcotics seized at arrest. Mascare-

nas contends that the narcotics could have been tampered with prior to trial because the bottles in which they were kept were not sealed and in the possession of the police at all times.

■■ The chain of custody rule requires that the proponent of real evidence establish that the evidence was involved in the incident and that the condition of the evidence at trial is substantially unchanged. *McCormick on Evidence* § 212 (E. Cleary ed. 1972); *State v. Serl,* 269 N.W.2d 785 (N.D.1978). The rule helps guarantee the authenticity of evidence tendered at trial.

■■ The drugs in this case were admitted through the testimony of Thomas Cole, the pharmacist from whom the drugs were stolen. The record indicates that the drugs seized from Mascarenas' car were in Cole's possession for one day during the period before trial. Despite the "break" in the chain of custody, the bottles of drugs had been initialed, cataloged, and photographed when they were seized as a part of the criminal investigation. The bottles also had coded labels identifying the contents and their source as Cole's pharmacy. The drugs were later admitted at trial after Cole testified that they were in fact those taken from his pharmacy. There is nothing in the record which indicates that the drugs had been altered; thus, the credibility of Cole's analysis of the substances and whether any tampering occurred during the "break" would be an issue for the trier of fact to resolve. Testimony at trial sufficiently traced the chain of custody of the drugs and "render[ed] it improbable that the original item ha[d] either been exchanged with another or been contaminated or tampered with." *McCormick, supra,* at 528. The trial court did not abuse its discretion in concluding that the drugs were admissible and supported by an adequate foundation. *People v. Atencio,* 193 Colo. 184, 565 P.2d 921 (1977); *People v. Smith,* 182 Colo. 228, 512 P.2d 269 (1973).

■■ We also note that under *People v. Lake,* 195 Colo. 454, 580 P.2d 788 (1978), narcotics can be admitted through a quali-

fied pharmacist. As in *People v. Lake,* the pharmacist here testified that the bottles and labels identified the drugs as a particular narcotic substance which was carried in his store. While the better practice is to subject suspected drugs to a chemical analysis, the proof offered in this case supports a prima facie case of aggravated robbery of narcotic drugs. *See People v. Edwards,* 198 Colo. 52, 598 P.2d 126 (1979). Furthermore, the defendant offered no evidence to rebut the prosecution's showing. Accordingly, the district court did not abuse its discretion by admitting the evidence pertaining to the stolen drugs.

## VIII.

In the El Paso County action, 80SA201, the district court's dismissal of the charges is affirmed. In the Weld County action, 81SA385, the convictions are reversed and the cause is remanded for a new trial in accordance the with views expressed in this opinion.

ROVIRA, J., does not participate.