NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JEREL TREMAYNE WILLIAMS,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12826
Trial Court No. 3AN-14-08109 CR

O P I N I O N

No. 2688 — January 15, 2021

Appeal from the Superior Court, Third Judicial District, Anchorage, Jack W. Smith and Michael Spaan, Judges.

Appearances: Marilyn J. Kamm, Attorney at Law, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

Following a jury trial, Jerel Tremayne Williams was convicted of second-degree murder and first-degree robbery in connection with the shooting death of Christopher Fulton.

Williams raises six claims on appeal. His first claim requires us to construe Alaska Evidence Rule 505(b) — the rule recognizing a confidential marital communications privilege. Williams argues that the trial court erred in ruling that conversations between him and his wife fell within the crime-fraud exception to this rule and were therefore not privileged. In particular, Williams contends that his request for his wife to buy him a plane ticket so he could flee the state was not made to enable or aid the planning or commission of a crime in which both he and his wife were joint participants, and as a result, his statements were not admissible under the crime-fraud exception to the privilege.

For the reasons explained in this opinion, we conclude that the crime-fraud exception to the confidential marital communications privilege does not require evidence of joint participation on the part of both spouses in an underlying criminal or fraudulent endeavor. The exception applies whenever one spouse makes a communication to enable or aid the planning or commission of a crime or fraud, regardless of the complicity of the other spouse. Because Williams's statements to his wife met this test, we agree with the trial court that they were not protected by the confidential marital communications privilege.

Williams also raises four additional claims of error related to: (1) purported deficiencies in the prosecutor's grand jury presentment; (2) the admissibility of an eyewitness identification; (3) restrictions on Williams's ability to cross-examine a witness about her expectations of favorable treatment in an unrelated criminal prosecution; and (4) the propriety of Williams's sentence. For the reasons explained in this opinion, we reject each of these claims of error.

Finally, Williams notes that his judgment erroneously reflects merger of his two second-degree murder convictions "for sentencing" only. The State concedes error. We conclude that this concession is well-founded.

We therefore remand Williams's case to the superior court with directions to amend the judgment to reflect a single conviction for second-degree murder. In all other respects, we affirm Williams's convictions and sentence.

*Background facts and procedural history*

In September 2014, Williams and his girlfriend, Samantha Herbert, went to an apartment belonging to Christopher Fulton. Williams had previously purchased heroin from Fulton. According to later testimony from Fulton's girlfriend, Josie Pritchard, Williams and Herbert entered the apartment uninvited, with Williams brandishing a handgun. While Herbert pilfered Fulton's and Pritchard's valuables, Fulton fought Williams for control of the gun. At some point during the struggle, Pritchard heard a "loud bang" and saw Fulton collapse, bleeding from a wound to the head. Fulton died from his injuries shortly thereafter.

Williams and Herbert fled the scene. At the time, Pritchard did not know Williams's name, although she had socialized with Williams and Herbert on a number of prior occasions. A roommate told Pritchard that the name of Herbert's boyfriend was "Derrick Hall," and it was this name that Pritchard conveyed to the police. Based on this information, the police constructed a photo lineup, from which Pritchard selected a suspect whose name was Derrick Hall.

A few days later, after learning from acquaintances that Herbert's boyfriend was not Derrick Hall, Pritchard contacted the police to inform them that she had made a mistake. In the interim, the police had located Derrick Hall in Las Vegas and verified that he was not in Alaska at the time of Fulton's death. Upon viewing a second photo lineup that contained Williams, Pritchard "instantly" recognized Williams as the person who had killed Fulton.

Two days after Fulton's death, Williams called his estranged wife, Laramie Williams (who was living in Georgia), and he asked her to buy him a plane ticket out of Alaska. Williams stated that he had shot someone in the face, and he referred Laramie Williams to news reports of Fulton's death and the resulting police investigation. Unbeknownst to Williams, Laramie Williams allowed her mother to listen to and record this conversation, and her mother later provided the recording to the police.

Williams was indicted and proceeded to trial on charges of first-degree murder, second-degree murder, and first-degree robbery.[1] The State pursued two theories of second-degree murder: (1) that Williams knowingly engaged in conduct that resulted in the death of another person under circumstances manifesting an extreme indifference to the value of human life, and (2) that in the course of committing or attempting to commit robbery, Williams caused the death of another person.[2]

At trial, Williams testified on his own behalf, and he offered an exculpatory account of the shooting. According to Williams, he and Herbert had gone to Fulton's apartment to purchase heroin. After one of Fulton's roommates let Williams and Herbert into the apartment, however, Fulton drew a gun. The two men struggled for control of the weapon, and during the course of the struggle, the gun went off. Williams then fled the apartment without knowing the extent of Fulton's injuries.

The jury ultimately acquitted Williams of first-degree murder but found him guilty of the remaining charges. At sentencing, the court merged the two second-degree murder counts and imposed a composite sentence for the murder and robbery of 75 years' imprisonment with 10 years suspended (65 years to serve).

---

[1] AS 11.41.100(a)(1)(A); AS 11.41.110(a)(2) & (a)(3); and AS 11.41.500(a), respectively.

[2] AS 11.41.110(a)(2) and (a)(3), respectively.

This appeal followed.

*Williams's argument that his statements to his wife were protected by the confidential marital communications privilege*

Prior to trial, Williams moved to dismiss his indictment, arguing that his statements to his wife were protected by the confidential marital communications privilege, and that the grand jury therefore should not have considered the recording of Williams's phone call, or the testimony from his wife or her mother.

The trial court denied Williams's motion. The court concluded that Williams had been attempting to persuade his wife to commit the crime of hindering prosecution by assisting him in fleeing apprehension for a felony, and thus the crime-fraud exception to the confidential marital communications privilege authorized admission of his incriminating statements.

Alaska Evidence Rule 505(b)(1) codifies the confidential marital communications privilege. This privilege precludes either spouse from being "examined as to any confidential communications made by one spouse to the other during the marriage, without the consent of the other spouse."[3] But the privilege is not absolute. Because it "impede[s] the normal truth-seeking function of court proceedings," the privilege is "strictly construed" and "accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'"[4]

---

[3]   Alaska R. Evid. 505(b)(1).

[4]   *Anderson v. State*, 436 P.3d 1071, 1074 (Alaska App. 2018) (quoting *Daniels v. State*, 681 P.2d 341, 344 (Alaska App. 1984), which in turn quotes *Trammel v. United States*, 445

(continued...)

The rule sets out multiple exceptions to the confidential marital communications privilege, including the crime-fraud exception. Under this exception, "There is no privilege [for confidential marital communications] . . . [i]f the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud."[5]

On appeal, Williams disputes the trial court's finding that he was soliciting his wife to commit the crime of hindering prosecution, and its further conclusion that his statements therefore fell within the crime-fraud exception to the privilege. Williams instead characterizes his actions as a request for his wife's "help in transporting her husband back to the family home." But the record amply supports the trial court's finding that Williams asked his wife to commit a crime. In discussing with his wife his request for a plane ticket, Williams emphasized that he had "shot [someone] in the face" and implied that he was the subject of a criminal investigation. And as Williams admits, his request for a plane ticket did not involve discussion of a particular destination, simply a desire to leave Alaska as soon as possible.[6]

A person commits the crime of first-degree hindering prosecution by "render[ing] assistance" to a person who has committed a felony with intent to "hinder

---

[4]    (...continued)
U.S. 40, 50 (1980)).

[5]    Alaska R. Evid. 505(b)(2)(B); *see also* Commentary to Alaska R. Evid. 505(b)(2)(B) ("This exception does not permit disclosure of communications that merely reveal a plan to commit a crime or fraud; it permits disclosure only of communications made to *enable or aid* anyone to commit or plan to commit a crime or fraud." (emphasis in original)).

[6]    We note that Williams and his wife were estranged, and had been separated for more than fifteen months. Williams's wife had already filled out divorce papers, which Williams had apparently signed at her request, long before he asked her to fund his flight out of Alaska.

the apprehension, prosecution, conviction, or punishment of that person."[7] Rendering assistance includes "provid[ing] or aid[ing] in providing the other person with money, transportation, . . . or other means of avoiding discovery or apprehension."[8]

Here, Williams asked his estranged wife to purchase a plane ticket for him for the stated reason that he had shot someone in the face, and as a result, had to "get out of here." In other words, he told his wife that he had committed a felony offense, and he solicited her to provide him with money or transportation to flee the jurisdiction to avoid apprehension.[9] Under these circumstances, we find no error in the trial court's conclusion that Williams's communication with his wife was made, in whole or in part, for the purpose of enabling the commission of a crime.

Williams also argues that the trial court misconstrued the crime-fraud exception. He urges this Court to interpret the exception to require joint participation by both spouses in a criminal endeavor before permitting the introduction of a defendant's marital communications.

Williams's argument is based on federal case law recognizing, under common law, a joint participation exception to the federal confidential marital communications privilege.[10] But the plain language of Alaska Evidence Rule 505(b),

---

[7]   AS 11.56.770(a)(1).

[8]   AS 11.56.770(b)(3).

[9]   AS 11.31.110(a) ("A person commits the crime of solicitation if, with intent to cause another to engage in conduct constituting a crime, the person solicits the other to engage in that conduct.").

[10]   *See, e.g.*, *United States v. Bey*, 188 F.3d 1, 5 (1st Cir. 1999); *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985); *United States v. Byrd*, 750 F.2d 585, 594 (7th Cir. 1984); *United States v. Cooper*, 85 F.Supp.2d 1, 31 (D.D.C. 2000).

which defines the scope of the privilege in Alaska law, contains no express requirement of joint participation.[11]

Moreover, as legal commentators have recognized, the federal joint participation exception "is not the same as a crime-fraud exception."[12] While the joint participation exception "requires that both spouses be criminally involved," the crime-fraud exception "requires only that one spouse be aware that the communication is for some nefarious purpose; it makes no difference that the other spouse is totally ignorant of the purpose."[13]

This approach is consistent with how other states have interpreted crime-fraud exceptions in their own jurisdictions — that is, without any requirement of complicity on the part of the non-defendant spouse.[14]

---

[11] *See* Alaska R. Evid. 505(b)(2)(B).

[12] *United States v. Davis*, 61 M.J. 530, 534 (A. Ct. Crim. App. 2005) (quoting 2 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* 743 (7th ed. 1998)); *see* 25 C. Wright & A. Miller, *Federal Practice and Procedure: Evidence* § 5594 ("[I]t is necessary to distinguish at the outset the [crime-fraud exception from the] so-called 'partners-in-crime' exception that some federal courts have recently created. The two exceptions are so hopelessly confused in the literature and the caselaw that it is doubtful that federal courts will ever get them straight, but it is essential that state courts and federal courts not yet committed to the error understand the differences between the two.") (footnotes omitted).

[13] 25 C. Wright & A. Miller, *Federal Practice and Procedure: Evidence* § 5594.

[14] *See, e.g.*, *People v. Santos*, 26 Cal.App.3d 397, 400, 402-03 (Cal. App. 1972) (holding that a defendant's request for his wife to "get rid of" a murder weapon was admissible under California's crime-fraud exception, regardless of the fact that the defendant's wife did not ultimately follow the defendant's directive to "get rid of" the weapon, and instead informed the police of its location); *State v. Heistand*, 708 S.W.2d 125, 126 (Mo. 1986) (en banc) (holding that the crime-fraud exception applied when a husband sent his wife a letter asking her to suborn perjury on his behalf); *People v. Naylor*, 120 A.D.2d 940, 940 (N.Y. App. Div. 1986) (holding that the defendant's attempt to enlist his wife's assistance in a criminal

(continued...)

This approach is also consistent with the Alaska Supreme Court's interpretation of the analogous crime-fraud exception to the attorney-client privilege.[15] The supreme court has held that the exception applies regardless of whether the attorney was aware of, or a joint participant in, the client's criminal conduct: "Although the fraud or crime must have been contemplated by the client at the time of the communication, it is irrelevant whether the attorney was aware of the client's purpose."[16]

We also note that reading a joint participation element into the crime-fraud exception would be contrary to the policy of interpreting the confidential marital communications privilege "as narrow[ly] as possible."[17]  Broadening the scope of the privilege to protect the type of communication at issue here — an attempt to persuade an estranged spouse to fund a defendant's flight from criminal prosecution — would not

---

[14]  (...continued)
scheme was made "in pursuit of a criminal enterprise" and therefore not entitled to the protection of the confidential marital communications privilege); *Henderson v. State*, 2017 WL 4172591, at *18-19 (Tex. App. Sept. 21, 2017) (unpublished) (holding that Texas's crime-fraud exception applied to a defendant's attempt to induce his wife to participate in insurance fraud); *State v. Smith*, 726 P.2d 1232, 1236-37 (Utah 1986) (holding that a defendant's request for his wife's assistance in pawning stolen property, without her knowledge that it was stolen, was admissible under Utah's crime-fraud exception).

[15]  Alaska R. Evid. 503(b) and (d)(1).

[16]  *Munn v. Bristol Bay Housing Authority*, 777 P.2d 188, 195 (Alaska 1989) (citations omitted); *see also Jorgens v. State*, 2013 WL 6168561, at *4 (Alaska App. Nov. 20, 2013) (unpublished) (addressing, in the context of a criminal prosecution, the crime-fraud exception to the attorney-client privilege).

[17]  *Salazar v. State*, 559 P.2d 66, 78 (Alaska 1976).

advance "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."[18]

We therefore reject Williams's claim of error and uphold the trial court's ruling that the confidential marital communications privilege did not protect Williams's statements to his wife.[19] We therefore uphold the trial court's denial of Williams's motion to dismiss the indictment on this ground.

*Williams's challenges to the prosecutor's grand jury presentment*

Williams next argues that the prosecutor improperly instructed the grand jury on the felony murder theory of second-degree murder and failed to present to the grand jury exculpatory evidence regarding Fulton's involvement in the drug trade.

The State argues that any error with regard to the grand jury instructions on the felony murder charge was necessarily harmless. We agree. Although Williams was indicted, and later found guilty by a jury, on two theories of second-degree murder, the court merged these counts into a single conviction for extreme indifference murder under AS 11.41.110(a)(2). Thus, Williams stands convicted of a single count of second-

---

[18] *Anderson v. State*, 436 P.3d 1071, 1075 (Alaska App. 2018) (quoting *Daniels v. State*, 681 P.2d 341, 344 (Alaska App. 1984), which in turn quotes *Trammel v. United States*, 445 U.S. 40, 50 (1980)).

[19] Williams also challenges the trial court's alternative finding that Williams waived the privilege by knowingly making his statements in the presence of a third party on his end of the phone call. Because we conclude that the statements were properly admitted under the crime-fraud exception, we do not reach this alternative finding.

degree murder.[20]  Even if we reversed Williams's conviction under the felony murder theory, he would remain convicted of a single count of second-degree murder.[21]

We also reject Williams's claim that the grand jury heard insufficient evidence of Fulton's involvement with controlled substances to satisfy the prosecutor's duty to present exculpatory evidence.[22]  The grand jurors heard evidence that Williams and Herbert went to Fulton's apartment to steal money and drugs, and that the police later found illegal drugs in the apartment.  As the trial court noted, additional evidence of Fulton's involvement in the distribution of controlled substances did not tend to negate Williams's guilt "in and of itself."[23]  Indeed, at trial, the State argued that Williams's knowledge of Fulton's access to heroin was inculpatory and established Williams's motive for the robbery.

Under these circumstances, we agree with the trial court that the prosecutor did not violate his duty to present exculpatory evidence to the grand jury.

*Williams's argument that the trial court erred in denying his motion to suppress Pritchard's identification*

As we explained earlier, Pritchard initially misidentified the shooter as a man named Derrick Hall.  But Pritchard subsequently informed the police that, although

---

[20]   *See Garhart v. State*, 147 P.3d 746, 752-53 (Alaska App. 2006).

[21]   *See Lawson v. State*, 264 P.3d 590, 596 (Alaska App. 2011) (concluding that any error with regard to the felony murder charge was harmless where a second count of second-degree murder under alternative theories ultimately merged with the felony murder count).

[22]   *See Frink v. State*, 597 P.2d 154, 165 (Alaska 1979) (recognizing a prosecutor's affirmative duty to present exculpatory evidence to the grand jury).

[23]   *See State v. McDonald*, 872 P.2d 627, 639 (Alaska App. 1994) (defining exculpatory evidence as evidence that "tends, in and of itself, to negate the defendant's guilt").

the person she had identified in the photo lineup had "look[ed] the most like" the shooter, she did not believe she had correctly identified Fulton's killer. The police, who had independently verified that Derrick Hall was not in Alaska at the time of Fulton's death, ultimately prepared a second photo lineup, which now included Williams. Upon viewing this lineup, Pritchard "instantly" recognized and identified Williams as the person who had killed Fulton.

Prior to trial, Williams filed a motion to suppress both Pritchard's pretrial identification and any subsequent in-court identification. After holding an evidentiary hearing, the trial court denied Williams's motion. The court noted that the second lineup was "double blind" — *i.e.*, neither Pritchard nor the officer presenting the lineup knew whether the photo array included Williams. The lineup was constructed so that Williams did not stand out from the other five potential suspects, and the officer gave Pritchard appropriate cautionary instructions before showing her the lineup. In contrast to Pritchard's equivocal identification from the first lineup, the court found that Pritchard was "exceptionally confident" in her identification of Williams. The court also found that, at the time of the charged offense, Pritchard had a relatively lengthy opportunity to observe Williams in "extremely strong" environmental conditions — *i.e.*, indoors in Pritchard's own home with favorable lighting — and that Williams had "at least a passing familiarity" with Williams from previous social encounters. After considering these and other factors, the court concluded that the second photo lineup was not unduly suggestive and that suppression was not warranted.[24]

On appeal, Williams renews his argument that Pritchard's identification was unreliable and should have been suppressed. But as the State points out, Williams's

---

[24] *See Young v. State*, 374 P.3d 395, 417-26 (Alaska 2016) (identifying six "system" variables and nine "estimator" variables that a court must consider when determining whether to suppress an identification as unreliable).

identity was not a contested issue at trial. Williams himself admitted going to Fulton's apartment, struggling with Fulton over the gun, and having his hands on the gun at the moment it discharged. Substantial additional evidence corroborated Williams's identity, including: Williams's admission to his estranged wife shortly after the murder that he had "shot [someone] in the face"; Williams's similar admission to Herbert's uncle that it was "either me or [Fulton]"; testimony from Fulton and Pritchard's roommate, who identified the people responsible for Fulton's death as Samantha Herbert and Herbert's boyfriend, and who saw Williams brandish a gun immediately before the shooting; and testimony from Herbert, who pleaded guilty to criminally negligent homicide for her role in the events leading to Fulton's death, and confirmed her relationship with Williams and their reliance on Fulton as a regular source of heroin.

Given this testimony, we conclude that even without Pritchard's identification, conclusive independent evidence established Williams's identity.[25] Thus, any error in declining to suppress Pritchard's identification was harmless beyond a reasonable doubt.

*Williams's argument that the trial court improperly restricted his ability to cross-examine Pritchard about an unrelated criminal prosecution*

At trial, Williams sought to cross-examine Pritchard about a pending petition to revoke probation that the State had filed against her following her conviction for misconduct involving a controlled substance. The trial court allowed Williams to question Pritchard about the petition to revoke probation and about any deal she had

---

[25] *See id.* at 410 (holding that any error in admitting an unreliable identification was harmless beyond a reasonable doubt where "'conclusive independent evidence, apart from the [unreliable] identification testimony,'" established the defendant's identity (quoting *McCracken v. State*, 521 P.2d 499, 504-05 (Alaska 1974)) (edit in *Young*)).

made or offers she had received from the State, but precluded any questions about the facts that led to her underlying conviction.

On appeal, Williams argues that the trial court's restriction of his ability to question Pritchard about the facts underlying her original charge violated his right to cross-examination.

In general, a defendant is entitled to "broad latitude" in cross-examining a witness about potential bias.[26] When an inference of bias arises from favorable treatment in a separate prosecution, this Court has recognized that, "The test is the witness' expectation or hope of a reward, not the actuality of a promise by the State."[27] However, the trial court retains discretion to limit the specific questions allowed and the specific evidence admitted, as long as the jury receives "information adequate to allow it to evaluate the bias and motives of a witness."[28] We have previously upheld restrictions on cross-examination related to the underlying facts of a witness's criminal conviction, where the defendant was able to elicit sufficient information to argue, and for the jury to infer, that the witness was biased in favor of the State.[29]

We reach the same conclusion in Williams's case. The trial court allowed Williams to fully develop the fact that Pritchard had an open criminal case and that she

---

[26] *Stumpf v. State*, 749 P.2d 880, 901 (Alaska App. 1988).

[27] *Wood v. State*, 837 P.2d 743, 747 (Alaska App. 1992) (quoting *State v. Little*, 350 P.2d 756, 760 (Ariz. 1960)) (additional citation omitted); *see also Braund v. State*, 12 P.3d 187, 191 (Alaska App. 2000) (holding that even if there was no formal agreement between a witness and the State, the trial court impermissibly infringed on the defendant's right to cross-examine the witness about her subjective belief that her willingness to testify resulted in dismissal of an unrelated criminal charge).

[28] *Stumpf*, 749 P.2d at 901; *Beltz v. State*, 895 P.2d 513, 518 (Alaska App. 1995).

[29] *See Mustafoski v. State*, 954 P.2d 1042, 1047 (Alaska App. 1998).

faced nearly a year in jail if she did not comply with the terms of her probation — as well as the fact that she had arguably attempted to capitalize on her status as a prosecution witness to curry favor in her probation proceedings. Although the trial court's ruling also allowed Williams to inquire about whether Pritchard had received, or believed she had received, "any sort of deal [from] the state," Williams chose not to inquire about Pritchard's understanding of any favorable treatment.

This was not a case where "the jury did not otherwise receive information adequate to allow it to evaluate the bias and motives of a witness."[30] We thus reject Williams's claim that the restriction on his ability to cross-examine Pritchard about the facts of her underlying conviction violated his right to cross-examination.

*Williams's challenge to his sentence*

At the time of sentencing, Williams was twenty-eight years old, and he had two prior felony convictions — a third-degree assault conviction for shooting at his then girlfriend and a third-degree weapons misconduct conviction for being a felon in possession of a concealable firearm. Williams also had multiple prior violations of probation.

Williams faced a sentencing range of 10 to 99 years for his second-degree murder conviction.[31] And as a third felony offender, he faced a presumptive sentencing range of 13 to 20 years for his first-degree robbery conviction, a class A felony.[32]

---

[30] *Stumpf*, 749 P.2d at 901.

[31] *See* former AS 12.55.125(b) (2014).

[32] *See* AS 11.41.500(b); former AS 12.55.125(c)(4) (2017).

At sentencing, the court discussed the *Chaney* criteria at length, emphasizing the seriousness of Williams's conduct and the need for isolation.[33] The court noted in particular that Williams was a third felony offender and that both of his prior felony convictions involved firearms. Before imposing sentence, the court referred to the parties' sentencing memoranda as particularly helpful to the court's determination of an appropriate sentence. The court then imposed a composite sentence of 65 years to serve: 65 years with 10 years suspended for the second-degree murder conviction, and 15 years for the first-degree robbery conviction, with 10 years running consecutively to the murder sentence.

Williams now challenges his sentence as excessive. Williams's primary contention is that the trial court's failure to conduct an on-the-record review of sentences imposed in similar second-degree murder cases requires a remand for resentencing.

We have previously recognized the importance of a sentencing court's consideration of comparable cases when imposing sentence to ensure against unjustified sentencing disparity.[34] But at its core, sentencing is an individualized process, and comparing one sentence with another is therefore not necessarily determinative of whether a sentence is excessive.[35] Rather, the absence of an explicit, on-the-record

---

[33]  *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970); AS 12.55.005.

[34]  *See Graham v. State*, 440 P.3d 309, 313 (Alaska App. 2019); *Pusich v. State*, 907 P.2d 29, 35 (Alaska App. 1995).

[35]  *Long v. State*, 772 P.2d 1099, 1102 (Alaska App. 1989). Indeed, appellate sentencing decisions represent only a small subset of sentencing decisions in Alaska — typically, only those longer sentences that defendants have elected to challenge. And our deferential standard of review means that when we conclude that a sentence is not excessive, we have simply concluded that the sentence is not "clearly mistaken" — *i.e.*, that it is does not fall outside "a permissible range of reasonable sentences." *Erickson v. State*, 950 P.2d 580, 586 (Alaska App. 1997) (internal quotations and citations omitted). A more comprehensive
(continued...)

comparison of sentences imposed in similar cases is most problematic when we are unable to discern the basis for the trial court's sentencing decision — that is, when the record is so lacking in detail as to preclude meaningful appellate review, or when the sentence itself appears arbitrary or disproportionate when examined against other cases.[36]

This is not one of those situations. Here, the State cited extensively to comparable cases in its sentencing memorandum, and the sentencing judge referred to the parties' memoranda during his sentencing remarks. The court engaged in a thorough review of the *Chaney* criteria. The composite sentence that the court imposed was well within both the sentencing ranges Williams faced, given his two prior felony convictions, as well as the range of sentences previously upheld by this Court for similar offenses.[37]

---

[35] (...continued)
comparison would include other trial court sentencing decisions, whether or not appealed.

[36] *See, e.g.*, *Ross v. State*, 836 P.2d 378, 384-85 (Alaska App. 1992) (remanding for resentencing where "the sentencing court's failure to make express findings concerning the seriousness of Ross' offenses in relation to other similar cases and the court's consequent failure to explain the apparent disparity of the sentence it elected to impose preclude[d] meaningful appellate review"); *West v. State*, 727 P.2d 1, 5 (Alaska App. 1986) (recognizing the importance of comparing the sentences imposed in similar cases and concluding, only after conducting that review, that the sentence imposed by the trial court was excessive); *see also State v. Bumpus*, 820 P.2d 298, 305 (Alaska 1991) ("A reviewing court cannot determine the appropriateness of a sentence where the sentencing court has failed to make adequate findings[.]").

[37] *See, e.g.*, *Smith v. State*, 2009 WL 1039834, at *1, *4 (Alaska App. Apr. 15, 2009) (unpublished) (affirming a composite sentence of 85 years' imprisonment for a defendant with two prior felony convictions who was found guilty of second-degree murder, first-degree robbery, and first-degree assault); *Morrell v. State*, 216 P.3d 574, 579 (Alaska App. 2009) (affirming a sentence of 60 years with 10 years suspended for a defendant convicted of second-degree murder for stabbing the victim following a minor traffic accident); *Allen v. State*, 51 P.3d 949, 961 (Alaska App. 2002) (affirming a sentence of 66 years to serve for second-degree murder where the defendant had three prior convictions for assault, including
(continued...)

Williams has not established that his sentence is clearly mistaken, or that he suffered any prejudice from the absence of an on-the-record recitation of sentences imposed in comparable cases.

*Williams's argument that his judgment should be amended to reflect a single conviction for second-degree murder*

Williams's final argument on appeal is that the trial court erred in characterizing the two second-degree murder counts as merging only "for sentencing" purposes.

The State concedes that Williams's convictions for two counts of second-degree murder, based on two different legal theories of the same offense, must merge into a single conviction.[38] Having independently reviewed the record, we conclude that the State's concession is well-founded.[39] We therefore direct the superior court to amend the judgment to reflect the entry of a single conviction for second-degree murder.

---

[37] (...continued)
two felony convictions); *Gustafson v. State*, 854 P.2d 751, 763-67 (Alaska App. 1993) (affirming a 65-year sentence for a defendant convicted of second-degree murder for firing a rifle at an unsuspecting car on the highway).

[38] *See Nicklie v. State*, 402 P.3d 424, 426 (Alaska App. 2017) ("Alaska law does not recognize the existence of a merger 'for sentencing purposes only.' . . . [W]hen a defendant is found guilty of counts that must merge, the merger results in a *single* conviction of record (and thus a single sentence)." (emphasis in original)); *see also Wagner v. State*, 2018 WL 5840510, at *5 (Alaska App. Nov. 7, 2018) (unpublished) (accepting the State's concession that the trial court erred in denoting on the judgment that two counts of second-degree murder "merged for sentencing").

[39] *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (holding that an appellate court must independently assess whether a concession of error "is supported by the record on appeal and has legal foundation").

*Conclusion*

We REMAND Williams's case to the superior court to amend the judgment to properly reflect the merger of the two counts of second-degree murder into a single conviction. In all other respects, the judgment of the superior court is AFFIRMED.